[No. A060253. First Dist., Div. Two. Sept. 12, 1996.]

LOUIS PETTUS, Plaintiff and Appellant, v.
ALAN R. COLE et al., Defendants and Respondents.

[No. A061485. First Dist., Div. Two. Sept. 12, 1996.]

LOUIS PETTUS, Plaintiff and Appellant, v.
E.I. DU PONT DE NEMOURS & COMPANY, INC., Defendant and
Respondent.

404

## COUNSEL

Darryl Parker for Plaintiff and Appellant.

Hassard, Bonnington, Rogers & Huber, Renee A. Richards, Thomas F. Kopshever, Arnelle, Hastie, McGee, Willis & Greene, William E. Hickman, Jeanne M. Samuels, O'Connor, Cohn, Dillon & Barr and Michael J. Fitzsimons for Defendants and Respondents.

## OPINION

**PHELAN, J.\*—**In the first of these consolidated cases, appellant Louis Pettus (Pettus) timely appeals from a final judgment entered in favor of two psychiatrists, respondents Dr. Kathleen Bell Unger and Dr. Alan Cole, as to his claims of unauthorized release of medical information in violation of the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq. (hereinafter the CMIA or the Act)),[1] and invasion of his constitutional right of privacy (Cal. Const., art. I, § 1).[2] At the close of Pettus's case-in-chief in a bench trial, the court granted Drs. Unger's and Cole's motions for judgment pursuant to Code of Civil Procedure section 631.8.

In the second case, Pettus seeks review of the court's judgment in favor of his employer, respondent E.I. du Pont de Nemours & Company, Inc. (hereinafter Du Pont), on claims of breach of contract, wrongful termination in violation of public policy, unauthorized use of medical information, and invasion of his constitutional right of privacy.[3] The court denied Du Pont's motion pursuant to Code of Civil Procedure section 631.8 at the close of plaintiff's evidence, but found against plaintiff on all claims following Du Pont's presentation of its case-in-chief.

---

\*Presiding Justice of the Court of Appeal, First District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All statutory references are to the Civil Code unless otherwise indicated.

[2] Appellant does not challenge the trial court's ruling as to a third claim for intentional interference with contract.

[3] Appellant does not challenge the trial court's decision as to his additional claims for race discrimination and retaliation.

The issues presented in these consolidated appeals include: (1) Whether and to what extent medical information compiled during the psychiatric examination of an employee may be disclosed to the employer by a psychiatrist without employee authorization or consent, where the employee has requested leave from work because of a stress-related disability, the examination is required under the employer's short-term disability policy, and the examination has been arranged and paid for by the employer; and (2) Whether discharging the same employee for refusal to comply with his employer's demand that he enroll in an inpatient alcohol rehabilitation program constitutes a violation of the employee's state constitutional right to privacy (Cal. Const., art. I, § 1) and/or wrongful termination in violation of public policy.

We conclude as a matter of law that Drs. Cole and Unger violated the CMIA by providing Du Pont a detailed report of their psychiatric examinations of Pettus without a specific written authorization for such disclosure. As to his claim under article I, section 1 of the California Constitution, we conclude that Pettus made a prima facie showing of invasion of privacy by the psychiatrists but, based on evidence presented by Du Pont in its defense case, there is a serious question whether Pettus waived this claim by voluntarily disclosing to his supervisors at Du Pont much of the sensitive personal information that was subsequently transmitted in the psychiatrists' reports. We will, therefore, remand for further evidentiary proceedings so that Drs. Cole and Unger may have an opportunity to present a defense to that claim.

As to Pettus's claims against his former employer, we conclude that Du Pont violated both the CMIA and Pettus's state constitutional rights to autonomy and informational privacy when it terminated his employment because of his refusal to comply with its demand that he enroll in an inpatient alcohol treatment program. Accordingly, we will reverse the judgment of the trial court as to all respondents and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Introduction.*

The material facts of this case are essentially undisputed. Appellant Pettus had been working for Du Pont for 22 years when, in June 1988, he sought to take time off from work because he was suffering from a disabling stress-related condition. Before requesting disability leave, Pettus sought medical help for his stress condition from his personal physician and from an

outpatient psychological counseling program at the Sierra Clinic. Both recommended to Du Pont that Pettus's stress condition warranted a disability leave.

Under Du Pont's short-term disability leave policy, Pettus was required to submit to examination by a Du Pont-selected doctor for verification of his need for disability leave. The policy provided for up to six months' leave, with pay, for nonoccupational illnesses or injuries. Du Pont was "self-insured" for purposes of its short-term disability leave policy.

In the course of having his disability verified, Pettus submitted to three medical examinations arranged and paid for by Du Pont. The first examination was with Dr. Collins, a physician under contract with Du Pont to provide general medical services for Du Pont employees. Dr. Collins verified Pettus's stress condition, and his need for time off, but believed a psychiatric evaluation was necessary. She recommended to Du Pont that Pettus should see Dr. Cole. The second examination was a psychiatric evaluation conducted by Dr. Cole. Dr. Cole verified appellant's stress condition and agreed that appellant had a legitimate medical need for time off work. Finally, Pettus underwent another psychiatric evaluation by Dr. Unger. Du Pont arranged for Pettus to see Dr. Unger after Dr. Cole reported that Pettus's stress condition might be linked to an alcohol abuse problem. Dr. Cole recommended Dr. Unger to Du Pont because she is a specialist in chemical dependency cases.

Pettus was terminated from his job at Du Pont on September 21, 1988, because he refused to enter a 30-day inpatient alcohol rehabilitation program that Du Pont required as a condition of continued employment. Pettus's alcohol consumption became a matter of concern to Du Pont when Drs. Cole and Unger disclosed to Du Pont in their disability evaluation reports that his stress condition might be caused or exacerbated by misuse of alcohol. However, the trial court specifically found that, "From all the evidence it is undisputed that plaintiff was not at any time an alcoholic, nor perhaps even an alcohol abuser in the more common lay use of the word." Drs. Unger and Cole also disclosed in their reports to Du Pont that Pettus believed his employers were racist, and that he had violent thoughts regarding a co-worker. Pettus contends that he did not authorize the doctors to disclose the full contents of their evaluations to Du Pont, and that the unauthorized release of such information to his supervisors, and the subsequent use of that information as the basis for terminating his employment, violated the CMIA and his state constitutional right to privacy.

B. *Pettus's Employment History With Du Pont.*

Pettus is a 52-year-old African-American who began employment with Du Pont in a South San Francisco plant as a laborer in 1966. Between 1966 and

1976, he rose through the ranks and became a first-line supervisor in various departments at the plant. When this plant was closed in 1982, Pettus was transferred to another in Flint, Michigan, where he retained his position as a supervisor. Shortly after arriving in Flint in November 1982, Pettus began to perceive that he was being harassed and discriminated against by his supervisor, Norman Conn. Pettus believed this was the result of his dating a White woman in whom Mr. Conn, who was White, also had a romantic interest. Pettus developed symptoms of severe emotional distress as a result of this perceived racially based harassment, including a rash for which he sought medical treatment.

In April 1984, Mr. Conn informed Pettus that he would be fired. There was conflicting testimony about Pettus's performance at Flint. Pettus testified that to his knowledge he had performed well. Other evidence presented at trial indicated that he had received "generally favorable" performance evaluations during his first year in Flint. However, there was also testimony that Pettus's shift had received several customer complaints during the last three or four months of his employment at the Flint plant, and that Pettus was criticized for failure to prepare an incident report, for miscommunication of shift changes, for poor preparation of meeting notes, and for time card errors. To avoid termination, Pettus transferred to a position as a warehouse operator in a Du Pont warehouse in Los Angeles, incurring a 50 percent reduction in salary.[4]

Pettus believed that upon transferring to Los Angeles he would be given a position comparable to the one he held in Flint, and he became increasingly frustrated when this opportunity did not materialize. He continued to be bothered by the poor treatment he believed he had received in Flint. His physical and emotional problems returned: stress, skin rash and—for the first time—high blood pressure.

In July 1987, at his request, Pettus transferred to a Du Pont automotive finishing plant in Hayward, California. He was initially employed as a warehouse worker, but in December 1987 he was given the chance to move

---

[4]In 1986, Pettus sued Du Pont for wrongful demotion and race discrimination in an action that was removed to the United States District Court for the Eastern District of Michigan. (*Pettus* v. *E.I. Du Pont De Nemours & Co., Inc.* (E.D.Mich. 1986) No. 86-CV-40539-FL.) In that case Pettus sought damages for, inter alia, "mental anguish and emotional distress." Although the trial court found some evidence of "racial bigotry" on the part of one of Pettus's supervisors at the Flint, Michigan plant, the court entered summary judgment for Du Pont based on "overwhelming evidence" from several other supervisors that plaintiff was demoted because his work performance was deficient. This judgment was affirmed by the United States Court of Appeals for the Sixth Circuit in a memorandum decision. (*Pettus* v. *E.I. du Pont de Nemours & Co., Inc.* (Feb. 23, 1990) No. 89-1225.)

up to a position as a sales assistant. The position never became permanent because he was not able to master the computer skills required for the job in the time allotted. During this time, Pettus continued to be bothered by the events in Flint, believing they contributed to his lack of career advancement with Du Pont.

In the fall of 1987 Pettus felt his anxiety return and his rash worsened. He sought medical attention from his personal physician who referred him to a psychiatrist, Dr. Walter Shervington. Pettus consulted with Dr. Shervington five to seven times in 1987.

During this time, Pettus was especially troubled by an incident relating to his failure to secure the sales assistant position. He had asked for help in learning the necessary computer skills from a colleague, Judy Mendonca, a White woman who had also trained for the position. Mendonca reported to Du Pont management that she was uncomfortable with Pettus's inquiries, and he was subsequently instructed not to speak to her for any reason. Pettus believed Ms. Mendonca's unwillingness to help him was motivated by racism. After the incident, he had stress reactions upon seeing her at work that caused him to get headaches and to become angry to the point where he sometimes felt like striking her.

### C. Pettus's Initial Requests for Time off of Work.

At a routine company physical examination on May 5, 1988, Pettus complained of his stress and skin rash to Dr. Carol Collins, a physician under contract with Du Pont to provide medical evaluation, physicals and treatment for Du Pont employees. Dr. Collins recommended that Pettus see a specialist dealing in stress conditions.

Soon thereafter, on or around May 24, 1988, Pettus sought stress counseling at the Sierra Clinic. On June 2, at the suggestion of a Sierra Clinic doctor, Pettus called his supervisor, Bill Taylor, to ask for a 90-day leave. Taylor told him he could not have a 90-day leave without the concurrence of a Du Pont physician in accordance with the company policy regarding requests for disability benefits. However, Bob Rotter, the division manager at the Hayward plant, became concerned about stress levels in the warehouse and worried that other employees might be experiencing problems similar to Pettus's.[5] Accordingly, Rotter asked Dr. Collins to arrange an appointment for Pettus with Dr. Dominick Fisichella, a dermatologist, in order to determine the cause of Pettus's skin rash. Dr. Fisichella examined appellant on

---

[5]Rotter first learned of Pettus's skin rash, and Dr. Collins's opinion that it was stress induced, during a conversation with Dr. Collins on May 31, 1988.

June 3, 1988, and determined that appellant's skin condition was not work related and was not disabling. Based on the dermatologist's findings, Rotter ordered Pettus to return to work on the following Monday, June 6.

On June 6, 1988, Pettus met with Rotter in his office. During that meeting, Pettus told Rotter that the stress he was suffering stemmed from the Flint incident and that he was angry at "members of management," a group in which Rotter believed himself to be included, and that the mere sight of Du Pont products could trigger his anger.[6] Pettus also told Rotter he felt anger toward Judy Mendonca, such that "he could hit her."[7]

On June 10, 1988, Dr. Ephrom of the Sierra Clinic wrote a letter to Taylor recommending that Pettus be given a 90-day leave of absence due to stress. Dr. Ephrom asserted that Pettus was suffering from an adjustment disorder that had been "brought on by a chronic job stress situation." Taylor told appellant he would forward the request for disability leave to Rotter. Rotter denied appellant's request for disability leave. According to Pettus, Rotter denied the request because he "didn't see anything on the job that was causing me to have any problems."

Pettus continued to work, but his stress and its physical manifestations persisted. He again sought medical treatment from his personal physician, Dr. Coleman. Dr. Coleman found that appellant's blood pressure was elevated and also detected a slight heart murmur. On June 14, 1988, he wrote a letter recommending that Pettus "remain off work for the next thirty days . . . because of his medical condition." Pettus submitted this letter to Taylor, who denied the request for leave because Dr. Coleman was not Du Pont's doctor.

Pettus was instructed to see the company physician, Dr. Collins, on June 16, 1988, to have his request for disability leave evaluated. Dr. Collins performed a repeat physical exam and also discussed with appellant some of his personal stresses and his difficulty sleeping. Dr. Collins reported her conclusions in a June 17, 1988, letter to Rotter, her sole contact at Du Pont. In that letter, Dr. Collins noted appellant's elevated blood pressure, heart murmur and rash, and concluded that these physical problems would not prevent him from performing his job.[8] Nevertheless, she recommended that Pettus not return to work because of the high level of mental stress he was

---

[6]Pettus also testified that sometime before his first meeting with Dr. Cole, he told Bill Taylor about "some of the problems [he] had at Flint."

[7]The evidence recited in this paragraph was not before the trial court when it granted the psychiatrists' motion for judgment pursuant to Code of Civil Procedure section 631.8.

[8]Rotter also spoke to Dr. Collins by telephone after she reexamined Pettus. Rotter's notes of that conversation reflect the following statements by Dr. Collins: "[Pettus] is on Xanax

experiencing. She reported that Pettus's stress seemed related to frustration over employment circumstances which began when he was working in Michigan,[9] but stated that she could not tell what proportion of his stress was due to work or other personal difficulties. Dr. Collins recommended that Pettus be given at least 30 days' leave in order to pursue intensive psychotherapy and personality assessment. At the end of that time, if further leave was required, Dr. Collins recommended that Pettus be reassessed by his therapist. Pursuant to Dr. Collins's evaluation, Pettus was immediately granted a 30-day paid disability leave.

Dr. Collins suggested to Rotter that appellant consult with Dr. Cole to obtain a psychiatric evaluation. Dr. Collins set up an appointment with Dr. Cole for Pettus. She wrote Dr. Cole a letter informing him that Pettus was a Du Pont employee being referred by the company for psychiatric assessment in connection with a "disability case" he had "filed against the company." For background information, Dr. Collins also forwarded to Dr. Cole her June 17, 1988, letter to Rotter, in which she had reported her findings from the June 16, 1988, physical examination.

### D. *Pettus's Consultation With Dr. Cole.*

Rotter informed Pettus of the appointment with Dr. Cole, which was scheduled for June 23, 1988. Pettus believed this appointment was necessary to secure disability leave. He understood that the purpose of the visit was to verify the physical and emotional problems he was having in order to qualify for disability leave under the company policy. Pettus knew the visit was not entirely confidential. He understood that Dr. Cole would report back to Du Pont a conclusion about whether his stress condition warranted disability

---

. . . mild tranquilizer. Hasn't taken any. Out last night . . . drinking. Shouldn't mix with alcohol." As far as the record discloses, this was the only reference to Pettus's then current drinking practices that was before the trial court when it granted the respondent psychiatrists' motion for judgment pursuant to Code of Civil Procedure section 631.8.

[9]Apparently, Rotter spoke with appellant by telephone on June 16, 1988, after Dr. Collins examined him. Rotter's contemporaneous notes of that conversation contain the following description of Pettus's comments about his treatment in Flint: "Was screwed over by one person. He knows one person can't fire him but the staff went along with him. . . . He feels like he was treated like an animal, turned into a nervous wreck. Started to become an alcoholic. Feel like [he] was treated unfairly. Last [performance evaluation] in Flint indicated he was doing a good job when management got involved. In three months he was gone." Pettus also described his then current thoughts about working for Du Pont in California, as follows: "He admits refinish has treated him fairly in L.A. and in San Francisco. Brought up the Judy incident after he was returned to the warehouse. [¶] Really has a problem with Judy, . . . and felt I and Roger was unfair to him. Starting to feel violent toward Judy/Rotter. Needs to see psychoanalyst to get cleared out." Again, the evidence recited in this footnote was not before the trial court when it granted the respondent psychiatrists' motion for judgment pursuant to Code of Civil Procedure section 631.8.

leave, but believed any such communication would be limited to this conclusionary purpose. It is undisputed that Dr. Cole never obtained written authorization from appellant to release medical information to Du Pont.[10]

During the examination, Pettus disclosed detailed information about his family history; his drinking habits in Flint; the incidents in Flint and in Hayward where he felt he was the victim of racial discrimination; his belief that Du Pont and its management were racist; his thoughts that he was beginning not to like White people, and that this bothered him; and his reoccurring skin rash.

Approximately an hour after the examination, Dr. Cole spoke with Rotter on the telephone and discussed the contents of his interview of Pettus. Dr. Cole discussed in detail appellant's medical and emotional condition, telling Rotter that he thought appellant had an alcohol problem, that this could potentially be his most serious problem, and that appellant had a great deal of frustration and emotional difficulty. Dr. Cole opined that Pettus was disabled by work-related stress, and recommended that Pettus be given leave. Prior to this phone conversation, Dr. Cole had had no direct contact with anyone connected to Du Pont. At the time of the call he was not aware of Rotter's position at Du Pont or of his relationship to Pettus, that of a second-line supervisor.

On June 23, 1988, Dr. Cole prepared a written report about his examination of Pettus, which was addressed to Rotter with a copy to Dr. Collins. Dr. Cole's report contained details of Pettus's work and family history, his drinking habits, his problems in Flint, and his thoughts of violence towards Ms. Mendonca, as well as his current psychiatric symptoms. More specifically, Dr. Cole reported that Pettus was "extremely angry, particularly at one of his coworkers, and [was] having a hard time controlling these feelings." Dr. Cole reported Pettus's comments about Judy Mendonca, as follows: " '. . . Every time I see her in particular, I get awful, awful upset.' . . . 'That's where the headaches come from. When I see her in the office, I look at her and just get angry. Du [P]ont has never been fair with minorities. I have been able to cope with racism all my life. I've begun to dislike white people, which is bothering me. I guess it's just harder to cope with it now that I'm getting older.' " Dr. Cole also reported Pettus's statement that he began "drinking excessively" three months before he was discharged from

---

[10]In a written report to Rotter, Dr. Cole stated that he informed Pettus that "the interview was not entirely confidential and that a report would be prepared based partly on his comments and forwarded to interested parties." According to Dr. Cole, Pettus thereafter "agreed to proceed." There is no evidence, however, that Dr. Cole ever attempted to obtain a written consent to disclosure.

the Flint plant in 1984. In response to Dr. Cole's question as to whether he had any guilt feelings, appellant said, " 'I really regret that I didn't hurt the guy in Flint. He ruined my whole life and I let him get away with it. I think if I saw him again, I would really try to kill him. I need to get over that.' "[11]

In his written report, Dr. Cole concluded that appellant was genuinely disabled, and that it would not be in appellant's best interests to return to work. Accordingly, on June 24, 1988, Rotter called Pettus at home to inform him that Du Pont was granting him a 90-day disability leave. Dr. Cole further concluded that there was a "distinct possibility" that Pettus was suffering from "a primary alcohol problem." Thus, Dr. Cole recommended that appellant be examined by a specialist in substance abuse cases. Following this suggestion, Dr. Collins referred Rotter to Dr. Unger, a psychiatrist with expertise in chemical dependency. Rotter arranged for Dr. Unger to meet with Pettus on July 6, 1988.

### E. *Pettus's Consultation With Dr. Unger.*

About a week before appellant's appointment with Dr. Unger, Rotter sent a cover letter to Dr. Unger along with Pettus's medical file, which contained the reports from Drs. Collins and Cole. In the letter, Rotter informed Dr. Unger that he had told Pettus of the appointment and that Pettus "appeared willing and cooperative." Rotter also specifically requested that Dr. Unger: (1) determine Pettus's mental condition and whether it would affect his ability to perform his duties as a warehouseman; (2) determine how deeply rooted his feelings of anger toward his fellow employees were; (3) determine whether he had an alcohol and/or other substance abuse problem, and, if so, how it affected his working relationships in Hayward; and (4) make recommendations for further treatment and how to proceed. In addition to the letter, Rotter communicated with Dr. Unger prior to Pettus's evaluation in a telephone call he placed to set up the appointment. In that conversation, Rotter told Dr. Unger that there was an urgent need for the interview to take place as soon as possible because he was concerned about the potential for Pettus to commit some violent act as a result of his hostile feeling toward Du Pont and Judy Mendonca.

Dr. Unger met with Pettus on July 6, 1988. Pettus testified that the meeting lasted no more than 30 minutes. Dr. Unger maintained it was about two hours long. Pettus understood the purpose of the interview with Dr.

---

[11]Dr. Cole further qualified this statement by saying that Pettus did "not have any plan to actively seek out this man and attempt to do harm to him." As to Pettus's hostility toward Judy Mendonca, Dr. Cole concluded that Pettus had "no specific intention" of hitting her and "made no specific threat."

Unger to be to the same as that of the examinations by Drs. Collins and Cole, to evaluate his request for stress-related disability leave. He was not aware of Rotter's written request to Dr. Unger for specific information, or that Rotter intended the interview to be in part an evaluation of the likelihood he might commit some violent act. He believed that Dr. Unger's communication with Du Pont would be limited to a conclusion about whether he was, in fact, suffering a stress-related disability. It is undisputed that Dr. Unger never obtained written authorization from Pettus to disclose medical information to Du Pont.[12]

Based on her discussion with appellant, the reports of Drs. Collins and Cole, and a telephone conversation prior to the meeting with Rotter, Dr. Unger prepared a written report addressed to Rotter, which contained information about appellant's family and work histories, his drinking habits, and his emotional condition. Specifically, Dr. Unger reported that Pettus suffered from deep-rooted and long-standing anger toward Du Pont, and was currently stressed beyond his ability to cope. She did not diagnose Pettus to be an alcoholic, but concluded that he was "using alcohol adversely," and that his use of alcohol was having an impact on his emotional problems and his life generally. In answer to Rotter's fear that Pettus might physically harm someone, Dr. Unger reported that appellant's anger had recently focused on Ms. Mendonca, but that he was not a threat to anyone in the workplace.[13] Dr. Unger explained that Pettus's hostile feelings were normal and could even be therapeutic.[14]

The first of her nine recommendations, which were listed in order of importance, was that appellant abstain for three months from alcohol use, a suggestion which appellant had come up with on his own and was willing to try. The last was that Pettus be terminated by Du Pont. Dr. Unger's other recommendations included experimenting with different medication, and establishing an exercise and nutritional program oriented toward weight loss.

---

[12]Appellant testified that Dr. Unger assured him that his feelings towards continued employment with Du Pont would be kept confidential. Dr. Unger could not recall giving appellant such assurances, and doubted that she ever would have made such a promise. There is, in any event, no evidence that Dr. Unger ever attempted to obtain a written consent to disclosure.

[13]Nevertheless, after receiving Dr. Unger's report, Rotter hired a security guard for the Hayward plant to "protect my other employees."

[14]Specifically, Dr. Unger said: "[I]n assessing the possibility that Mr. Pettus may do bodily harm to someone, it is important to keep in mind that Mr. Pettus is a man of middle age who has no history of acts of violence. Fantasies of performing violent acts are actually quite common in human experience, and are entertained from time to time by even the most gentle of human beings. Rather than being predictive of future violence, such fantasies actually serve as a psychological 'safety valve,' permitting the vicarious, but safe and harmless discharge of strong emotions. Experiencing the fantasy of taking violent revenge often reduces the impulse of performing the behavior. There is a very great and very crucial difference between merely thinking about performing some action, and the physical doing of that act."

On the morning following her evaluation of appellant, Dr. Unger spoke by telephone with Rotter and discussed the meeting and her recommendations with him in detail. During the time she was in communication with Rotter about Pettus, she knew him to be appellant's supervisor and a manager at the Hayward plant.

### F. Termination of Pettus's Employment With Du Pont.

The written reports of Drs. Collins, Cole and Unger were sent to Joseph Montovino, Du Pont employee relations manager in Wilmington, Delaware. Mr. Montovino's task was to coordinate a review of Pettus's situation with Du Pont's medical and substance abuse groups. To that end, Mr. Montovino forwarded the reports to Dr. Alan J. Hay of Du Pont's corporate medical department, and to Walter Beam,[15] the director of Du Pont's substance abuse program for its 140,000 employees worldwide. Based on their review of the reports and consultations between themselves and with Dr. Hay, Mr. Montovino and Dr. Beam decided that Pettus would be required to enter a 30-day, inpatient alcohol treatment program as a condition to his return to work.[16] It was Dr. Beam's opinion that such a program would provide the best chance for Pettus to return to work.

On August 1, 1988, Montovino and Rotter met with appellant to discuss his future with the company. Also in attendance at that meeting was Stephen Howard, regional manager for Du Pont. Pettus was told that in order to continue his employment with Du Pont, he would be required to enroll in an inpatient alcohol treatment program, possibly followed by a psychiatric program.[17] If he was unwilling to attend such a program, then he had the alternatives of resigning and taking early permanent retirement, or seeking a

---

[15]Although the parties and the trial court refer to Walter Beam as "Dr. Beam," his doctorate is an Ed.D. He has no formal medical training, and his training in matters of substance abuse was acquired in continuing education programs.

[16]Dr. Beam explained that Pettus would not necessarily have been required to complete a full 30 days of inpatient treatment. Rather, he would have been evaluated during the first 10 days and thereafter released if it was determined that such treatment was inappropriate. However, Dr. Beam further stated that Pettus could not be told this because, if he was an alcoholic in denial, it might reinforce that denial and interfere with his progress in treatment if he thought he could get out in just a few days.

[17]At Dr. Unger's recommendation, Du Pont directed Pettus to attend the drug and alcohol treatment program at the Garden Sullivan Hospital, which is part of the Pacific Medical Center in San Francisco. Mr. Montovino admitted that this course of action was *not* the one ordinarily followed with employees who were identified as possibly having alcohol problems. Under the company's "Employee Alcoholism Procedure," the company simply offers the employees treatment and, if declined, informs the employees that they did so at their own peril and can be terminated for performance problems that might occur after they refuse treatment.

disability retirement. Pettus expressed his desire to get his own physician's opinion as to whether he was an alcoholic, which Du Pont allowed him to do.

Appellant tried to obtain an independent evaluation from his own psychiatrist, Dr. Shervington, but was unsuccessful in that attempt. Du Pont, for its part, tried to contact Dr. Shervington on numerous occasions between September 1 and September 15, but was also unsuccessful. Apparently, Dr. Shervington had met with Pettus on August 17, 1988, and informed him that he could not comply with his request for an opinion whether he needed treatment for alcohol abuse because he did not have enough information. However, Pettus did not tell Du Pont that he would not be able to provide an opinion from Dr. Shervington.

On September 21, 1988, Pettus received a letter from Rotter stating that he had to respond to Du Pont's demand that he enter the alcohol treatment program by September 26. Appellant's employment was terminated on September 23, 1988, after he told Taylor that he would not agree to enter the alcohol rehabilitation program. At that point, Pettus discussed his dilemma with Dr. Shervington, who urged him to enroll in the alcohol treatment program, if only to demonstrate to Du Pont that he was not an alcoholic. Pettus then contacted Taylor to say he had changed his mind, but Taylor told him it was too late.

## II. THE APPEAL FROM JUDGMENT IN FAVOR OF DRS. COLE AND UNGER

### A. *Standard of Review.*

As a threshold matter, we establish the standard of review for the judgment in favor of Drs. Cole and Unger. In granting that judgment, the trial court proceeded under Code of Civil Procedure section 631.8 which, in relevant part, provides: "After a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party . . . ." (*Id.*, subd. (a).) The purpose of Code of Civil Procedure section 631.8 is to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact. (*Connolley* v. *Bull* (1968) 258 Cal.App.2d 183 [65 Cal.Rptr. 689].)

The standard of review after a trial court issues judgment pursuant to Code of Civil Procedure section 631.8 is the same as if the court had

rendered judgment after a completed trial—that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies. An appellate court must view the evidence most favorably to the respondents and uphold the judgment if there is any substantial evidence to support it. (*Rodriguez* v. *North American Rockwell Corp.* (1972) 28 Cal.App.3d 441, 447 [104 Cal.Rptr. 678]; *Miller* v. *Dussault* (1972) 26 Cal.App.3d 311, 316 [103 Cal.Rptr. 147].) However where, as here, we are called upon to review a conclusion of law based on undisputed facts, we are not bound by the trial court's decision and are free to draw our own conclusions of law. (*Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308, 317 [282 Cal.Rptr. 354].)

### B. *Pettus's Claim Under Section 56.10.*

 Pettus first contends that, as a matter of law, Drs. Unger and Cole violated the CMIA when they disclosed to his supervisors at Du Pont the detailed reports of his psychiatric evaluations. For reasons we will elaborate, we agree.

### 1. *An Overview of the CMIA.*

The CMIA was originally enacted as Senate Bill No. 480 in 1979. (See Stats. 1979, ch. 773, § 1, p. 2645.) Senate Bill No. 480 was heavily criticized for being organizationally unsound, ambiguous and practically impossible to implement, and was subject to a series of moratoria which prevented it from ever taking effect. (Sen. Com. on Judiciary, Background Information to Sen. Bill No. 889; see also *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 38 [32 Cal.Rptr.2d 200, 876 P.2d 999].) In 1981, Senate Bill No. 480 was repealed by Senate Bill No. 889, and the CMIA was reenacted as amended. (Stats. 1981, ch. 782, §§ 1.5, 2, p. 3040.) One major criticism of the original version of the CMIA was that it left unclear whether certain medical information could be released without an authorization. (Letter from California Hospital Association to Governor Edmund G. Brown, Sept. 21, 1981.) Unfortunately, this shortcoming was not completely resolved when the Act was amended to its present form. (See *Heller* v. *Norcal Mutual Ins. Co.*, *supra*, 8 Cal.4th at pp. 38-42.)

The basic scheme of the CMIA, as amended in 1981, is that a provider of health care must not disclose medical information without a written authorization from the patient. Section 56.10, subdivision (a), provides that: "No provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization, except as provided in subdivision (b) or (c)." As our Supreme Court has observed, "Considered

together, the statutory provisions require a health care provider to hold confidential a patient's medical information unless the information falls under one of several exceptions to the act." (*Heller* v. *Norcal Mutual Ins. Co.*, *supra*, 8 Cal.4th at p. 38.)

The "authorization" requirements, which are found in section 56.11, are detailed and demanding, reflecting the Legislature's interest in assuring that medical information may be disclosed only for a narrowly defined purpose, to an identified party, for a limited period of time. For an authorization to be valid it must be handwritten or typed, in language clearly separate from any other language on the same page, and properly signed and dated by the patient or one of the permissible substitutes enumerated under the Act. The signature must serve no other purpose than to execute the authorization. (§ 56.11 subds. (a), (b) & (c).) The authorization must state "the specific uses and limitations on the types of medical information to be disclosed[,] [¶] . . . the name or functions of the provider of health care that may disclose the information[,] [¶] . . . the name or functions of the persons or entities authorized to receive the medical information[,] [¶] . . . the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information[,] [¶] . . . a specific date after which the provider of health care is no longer authorized to disclose the medical information[,]" and that the person signing the authorization has been advised of the right to receive a copy of the authorization. (§ 56.11, subds. (d)-(i).)

Under normal circumstances, where there is no valid authorization there can be no disclosure. (§ 56.10, subd. (a).) However, a provider who has made an unauthorized disclosure is relieved from liability if it can show that the disclosure is excepted either by the mandatory (*id.*, subd. (b)) or permissive (*id.*, subd. (c)) provisions of the act, allowing disclosure of medical information without prior authorization under specified circumstances. In this case, there is no question that the disclosures were not made pursuant to a section 56.11 authorization.

The Act provides that disclosure is mandatory even in the absence of an authorization when compelled by court order, subpoena, or search warrant or "otherwise specifically required by law." (§ 56.10, subd. (b)(1)-(7).) These mandatory disclosure provisions do not apply here.

The Act also provides that disclosure is permissible without an authorization in several types of situations. The dispute in this case is over which of these permissive disclosure provisions, if any, applies to the facts at hand and whether the disclosures made by Drs. Unger and Cole violated the applicable provision.

It is important to note that even the permissive disclosure exceptions do not always allow full disclosure of all medical information. The exceptions recognize that in some circumstances a legitimate need for access to medical information may conflict with an individual's interest in keeping that information confidential, and attempt to strike a balance. Thus, under some of the exceptions described in section 56.10, subdivision (c)(1) through (14) the Legislature established parameters within which disclosure is permissible and allowed disclosure of only that information which is necessary to achieve the legitimate purpose addressed by the particular exception.

The list of permissive exceptions is lengthy, and some are difficult to rationalize. To discern which of the exceptions the Legislature intended to apply to the circumstances of this case, it is useful to look at the range of situations contemplated by the exceptions. Disclosure to other health care providers is permissible "for purposes of diagnosis or treatment of the patient." (§ 56.10, subd. (c)(1).) Disclosure is permissible to an entity responsible for paying a medical bill (and to billing services) "to the extent necessary to allow responsibility for payment to be determined and payment to be made." (*Id.*, subd. (c)(2), (3).) Disclosure is permissible to groups performing peer review "or to persons or organizations insuring, responsible for, or defending professional liability which a provider may incur," if the groups or persons "are engaged in reviewing the competence or qualifications of health care professionals or in reviewing health care services with respect to medical necessity, level of care, quality of care, or justification of charges." (*Id.*, subd. (c)(4).) Disclosure is permissible for the purpose of licensing or accrediting a provider of health care (*id.*, subd. (c)(5)); for the purpose of a coroner's investigation (*id.*, subd. (c)(6)); and for bona fide medical research, provided that no information so disclosed should be further disclosed by the recipient in any way which would permit identification of the patient (*id.*, subd. (c)(7)).

Under section 56.10, subdivision (c)(8), a "provider of health care that has created medical information as a result of employment-related health care services to an employee conducted at the specific prior written request and expense of the employer may disclose to the employee's employer that part of the information which: [¶] (A) Is relevant in a law suit, arbitration, grievance, or other claim or challenge to which the employer and the employee are parties and in which the patient has placed in issue his or her medical history, mental or physical condition, or treatment, provided it may only be used or disclosed in connection with that proceeding. [¶] (B) Describes functional limitations of the patient that may entitle the patient to leave from work for medical reasons or limit the patient's fitness to perform his or her present employment, provided that no statement of medical cause is included in the information disclosed."

Section 56.10, subdivision (c)(9), provides: "Unless the provider is notified in writing of an agreement by the sponsor, insurer, or administrator to the contrary, the [medical] information may be disclosed to a sponsor, insurer, or administrator of a group or individual insured or uninsured plan or policy which the patient seeks coverage by or benefits from, if the information was created by the provider of health care as the result of services conducted at the specific prior written request and expense of the sponsor, insurer, or administrator for the purpose of evaluating the application for coverage or benefits."

Disclosure is also permissible to a group practice plan for the purpose of administering the group practice plan (§ 56.10, subd. (c)(10)); to insurance agents in compliance with certain Insurance Code provisions (*id.*, subd. (c)(11)); to a probate court investigator under certain circumstances (*id.*, subd. (c)(12)); to a tissue bank, under specified circumstances (*id.*, subd. (c)(13)); and when the disclosure is "otherwise specifically authorized by law" (*id.*, subd. (c)(14)).

Most of these permissive disclosure exceptions can be easily eliminated as inapplicable to the fact situation here. Respondents Unger and Cole argue that section 56.10, subdivision (c)(8)(A) and (9) both apply, and that the disclosures made in this case were permitted under both subparagraphs. Appellant argues that subdivision (c)(8)(B) is the applicable provision and that the disclosures were not protected under it. Adhering to the fundamental canon of statutory interpretation to "give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose" (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873]), we read each exception listed in subdivision (c)(1) through (14) in pari materia. Doing so, we conclude that subdivision (c)(8)(B) is the provision most apposite to the facts at hand and that it therefore governs this case. We further conclude that the disclosures made by Drs. Unger and Cole exceeded the parameters established in subdivision (c)(8)(B), which limit the permissible disclosure to a description of any "functional limitations" and explicitly prohibit disclosure of "medical cause" of the limitation.[18]

### 2. *Pettus was a "Patient" of Drs. Cole and Unger for Purposes of the CMIA.*

Before turning to the merits of appellant's claim under the CMIA, we must dispose of Dr. Cole's threshold argument that Pettus is not protected by section 56.10 because he does not qualify as a "patient" within the

---

[18]Because we conclude that Drs. Unger and Cole exceeded the scope of disclosure permitted by subdivision (c)(8)(B), we need not discuss whether they had an appropriate "specific prior written request" from Du Pont so as to bring them within the privilege provided by that subdivision.

meaning of the statute.[19] We disagree with Dr. Cole's interpretation, and find it contrary to both the letter and spirit of the statute. Under the CMIA, a patient is "any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains." (§ 56.05, subd. (c).) Another pertinent definition is that of "medical information," which means "any individually identifiable information in possession of or derived from a provider of health care regarding a patient's medical history, mental or physical condition, or treatment." (§ 56.05, subd. (b).)

Dr. Cole contends that no health care services were provided to or received by Pettus, and that, therefore, he was not a "patient" under section 56.10. In support of this contention Dr. Cole claims that the psychiatric evaluation he performed was for the sole purpose of advising Pettus's employer of his findings with respect to appellant's disability claim, not to advise Pettus. Though his report made explicit recommendations for treatment, he argues these recommendations were generated for Du Pont's information. He further contends that Pettus was not a "patient" because he saw Pettus on a single occasion, no care or treatment was contemplated, and no doctor/patient relationship existed between them.

When the definition of patient is construed in relation to the other statutory definitions and in view of the statute's purpose, respondent Cole's position is patently untenable. It is undisputed that Dr. Cole's meeting with Pettus generated highly sensitive medical information which was subsequently reported to Du Pont. According to statutory definitions, "medical information" is information "derived from a provider of health care" and a patient is someone who has received health care services from a provider of health care and to whom medical information pertains. (§ 56.05, subds. (b), (c).) Unfortunately, the term "health care services" is not defined by the Act. However, logic dictates that in order for a health care provider to gather medical information about a person, the provider must have dealt with the person at some level and performed professional services of some type. By failing to include the term "health care services" in the list of definitions, the drafters failed to define the precise level of interaction between the provider and the subject necessary to constitute "health care services." It is, however, appropriate to construe the term in a manner which effectuates the purpose of the statute. (*Harris* v. *Capital Growth Investors XIV*, *supra*, 52 Cal.3d at p.

---

[19]At oral argument, Dr. Unger acknowledged that her theory of defense at trial was based on the permissive disclosure exception in section 56.10, subdivision (c)(9), and that she had not theretofore contended Pettus was not a "patient" within the meaning of the CMIA. She argued, however, that she was now convinced Dr. Cole was correct in pursuing the latter argument. Because we reject Dr. Cole's argument, we need not decide whether Dr. Unger waived her claim that Pettus was never her "patient."

1159.) Doing so, we find that Pettus is a "patient" for purposes of section 56.10. The Legislature clearly intended for the statute to afford employees in Pettus's situation—i.e., where the employer has requested and paid for a medical examination to determine the validity of a claim for medical leave benefits—some protection by imposing a duty on health care providers involved in the procedure a duty to maintain, at least to a limited degree, the confidentiality of the employee's medical information. (See § 56.10, subd. (c)(8)(B).) Indeed, subdivision (c)(8)(B) expressly refers to an employee who is examined by a health care provider, at the employer's request and expense, as a "patient."

We do agree, however, that the traditional doctor/patient relationship, with the host of concomitant duties created by such a relationship, was not established between appellant and the respondent psychiatrists. This is the proposition for which both cases cited by Dr. Cole in his opening brief stand. In *Felton* v. *Shaeffer* (1991) 229 Cal.App.3d 229 [279 Cal.Rptr. 713], the defendant physician performed a preemployment physical on plaintiff and made an erroneous conclusion about the plaintiff's fitness which caused him to be rejected by the employer. The court held against the plaintiff in subsequent actions against the physician for negligence and medical malpractice, finding that defendant's sole function was to provide information to the prospective employer, that no doctor/patient relationship was created, and that, therefore, defendant owed no duty of care to the plaintiff. In *Keene* v. *Wiggins* (1977) 69 Cal.App.3d 308 [138 Cal.Rptr. 3], plaintiff was a worker sent to defendant doctor by his workers' compensation carrier for examination following an industrial accident. The doctor wrote a letter to the insurance carrier opining no treatment was necessary. Plaintiff received a copy of the report and allegedly relied on it to his detriment. The court held the doctor was not liable to the plaintiff for negligence or medical malpractice in making the report since the doctor conducted the examination only for the purpose of rating the plaintiff's injury for the insurance carrier. The court further held that there was no doctor/patient relationship of the sort giving rise to a duty of care owed to the plaintiff in connection with the medical report.

In the case before us, plaintiff is similarly situated in that he is bringing an action against a doctor who examined him at the request of a third party, his employer, Du Pont. If Pettus brought a professional negligence claim against Dr. Cole or Dr. Unger, he would likely be defeated under the authority of *Keene* and *Felton.* Pettus, however, does not rely on common law theories of negligence or medical malpractice. Rather, he is seeking to enforce a duty of

confidentiality codified in the CMIA. For purposes of that statute he is, clearly, a "patient."[20]

### 3. *Section 56.10, subdivision (c)(8)(B) Governs the Type of Disclosure at Issue in This Case.*

It is not clear from either the trial court's reasons for decision or its comments at trial under which portion of section 56.10 the court rejected Pettus's CMIA claim against Drs. Cole and Unger. In granting the nonsuit to the psychiatrists, the court concluded that Du Pont was entitled to "full and complete information," stating: "It is the court's opinion that doctors Unger and Cole both gave a report fully within the authorization of section 56.10, that there was nothing inappropriate, that the employer was indeed entitled to secure full and complete information. That was what they were doing. [¶] First they sent him to a general doctor, and the general doctor said it has got some psychiatric overlay and underlay. [¶] And the psychiatrist said I can't tell if it is engendered from ingestion of a substance, whether overuse of sugar, or thyroid, or something else, or alcohol, or whether it is purely a psychiatric chemical problem within the mind. I don't know. I think you need to talk to somebody that specializes in that area. [¶] And they did. And the doctor responded to the questions. [¶] I'm going to grant the non-suit as to the doctors." When plaintiff's counsel asked the court to clarify whether it made "a specific ruling on what exception to section 56.10[, subdivision] (a) applied," the court replied, "No. 56.10. I'm not going to go further than that."

In its reasons for decision, the trial court utterly failed to deal with the specific terms of the statute.[21] The court prefaced its short discussion about the disclosure with its conclusion that Du Pont had the right to request and

---

[20]In their petition for rehearing, Drs. Cole and Unger argue that they must be allowed on remand to present expert testimony about whether appellant was a "patient" within the meaning of the CMIA. This issue is one of law that is not properly the subject of expert testimony. (See, e.g., *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 638 [224 Cal.Rptr. 865]; *Bay General Community Hospital* v. *County of San Diego* (1984) 156 Cal.App.3d 944, 963 [203 Cal.Rptr. 184]; *Carter* v. *City of Los Angeles* (1945) 67 Cal.App.2d 524, 528 [154 P.2d 907].)

[21]Curiously, so does Dr. Unger. Despite its obvious potential relevance to the facts at hand, she makes no argument whatsoever about the applicability of subdivision (c)(8)(B). Dr. Cole devotes only minimal attention to that subdivision, arguing that the information he provided to Du Pont did not include the "medical cause" of Pettus's disability. This argument borders on the facetious. Dr. Cole's report contains detailed medical, family and social histories, a finding of psychiatric disability, and a thorough "DSM-IIIR" diagnosis of Pettus's psychiatric condition, as follows: "Axis I: Adjustment disorder with mixed emotional features[;] Alcohol abuse[;] Psychological factors affecting physical condition[.] Axis II: Paranoid and narcissistic personality characteristics not reaching the level of a formal personality disorder diagnosis. Axis III: History of eczema exacerbated by the Axis I problems. Axis IV: Severity of

receive the information the psychiatrists disclosed: "Defendant [Du Pont] was entitled under the law generally and specifically under published company policy to verify through their own employed or retained doctors any asserted or claimed medical disability to work. [¶] [Du Pont], as anyone else, employer or employee, is entitled to employ its own expert, be it doctor or lawyer or whatever, and have a full report of that expert's findings and their recommendations." Discussing the plaintiff's claims against the doctors the court continued: "It is nonsense to argue that defendant's doctor could not make a full and complete report and recommendation to [Du Pont] in this case concerning plaintiff, and that defendant was only entitled to a simple conclusion of whether plaintiff was or was not in medical need of a 90 day leave of absence. . . . No case has been cited nor does the court know of any case so limiting anyone who is entitled, in the first instance, to have their doctors examine someone."

The trial court's analysis cannot be reconciled with the language or spirit of the CMIA. The court focused on Du Pont's claimed entitlement to obtain all the information it believed it needed to adequately handle Pettus's request for disability leave, disregarding the fact that the statute does not always allow health care providers to provide such full disclosure. The Legislature recognized in section 56.10, subdivision (c)(8)(B), that the ability of employers to obtain some medical information without employee authorization may serve a legitimate purpose under some circumstances. At the same time it sought to preserve the employee's interest in maintaining the confidentiality of sensitive medical information in the employment context. To balance these interests, the Legislature restricted the information that may be disclosed without authorization to only that which is necessary to achieve the legitimate purpose. Where an employee has submitted to a medical examination to verify a disability that "may entitle the patient to leave from work for medical reasons," the Legislature determined that the information needed by the employer for verification is a description of the "functional limitations of the patient." (§ 56.10, subdivision (c)(8)(B).) Thus, this information may be disclosed to the employer without a written authorization from the patient. In contrast, in the absence of a written authorization from the employee, the Legislature explicitly prohibited disclosure of any "statement of medical cause" of the disability. (*Ibid.*) This information is not necessary to achieve the legitimate purpose envisioned in subdivision (c)(8)(B) and, therefore, may not be disclosed without patient authorization. The trial court's conclusion that an employer that is entitled to have its doctors examine an employee is entitled to a "full and complete report" of the

psychosocial stressors—mild. Axis V: Highest level of adaptive functioning in past year—good." It is difficult to imagine a more comprehensive report of the "medical cause" of a stress-related disability.

contents of the examination runs counter to the Legislature's attempt to balance the competing interests.

The fact that Du Pont may be "entitled to employ its own expert" to examine an employee under certain circumstances[22] does not, contrary to the trial court's holding, entitle it to a "full report of the expert's findings and recommendations" when determining an employee's eligibility for disability leave. Because the employer arranged and paid for the medical examination does not abrogate the employee's right to confidentiality of the information generated by the examination. This interpretation would nullify the Legislature's attempt to protect employee medical information under section 56.10, subdivision (c)(8)(B), and we decline to adopt it.

The language employed in section 56.10, subdivision (c)(8)(B), specifically restricts permissible disclosure to an employer to a description of the "functional limitations" of the employee who has been examined. The disclosures made by Drs. Cole and Unger to Du Pont describing in detail Pettus's hostility toward the company and a coworker, his drinking habits and other details about his personal life go well beyond a description of "functional limitations." The stated purpose of the CMIA, as amended, is "to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." (Stats. 1981, ch. 782, § 1, p. 3040.) ■ By enacting section 56.10, subdivision (c)(8)(B), the Legislature has determined that the unauthorized disclosure to employers of further detailed medical information about employees is not a reasonable use of that information.

There are, of course, good policy reasons for such a conclusion. If a health care professional were free to give an employer all the details of an employee's personal life and physical and mental health as revealed during a disability evaluation, there would be a great disincentive to full and honest disclosure by the employee. Indeed, in many cases of psychological disability, there would be a strong disincentive to the employee to seek professional help at all. Neither employees nor employers would be well served by such a rule. Employers would not get an accurate evaluation of their employees' ability to work (and entitlement to medical leave), employees would not get the benefit of a candid health assessment by the examiner, and employees would in some cases not get the health care they need to be productive

---

[22]Perhaps the court had in mind the type of disclosure permitted with respect to a mental examination conducted pursuant to section 2032 of the Code of Civil Procedure where a party's mental condition is at issue in ordinary civil litigation. Even there, however, the scope of the examination—and, thus, the scope of disclosure—will be closely regulated by the trial court (Code Civ. Proc., § 2032, subds. (d), (h)), unless the parties are able to negotiate a written agreement as to those and other issues (*id*, subd. (e)).

workers and members of society. Our holding is, thus, firmly rooted in both the plain language of the CMIA and in sound considerations of public policy.

### 4. *Section 56.10, subdivision (c)(8)(A), Is Inapplicable to a Dispute Over an Employee's Entitlement to Medical Leave.*

██ We turn next to respondents' argument that the dispute over Pettus's request for disability leave was a "law suit, arbitration, grievance or other claim or challenge," i.e., a "proceeding" to which Du Pont and Pettus were "parties," within the meaning of section 56.10, subdivision (c)(8)(A). The facts of this case do not support a finding to that effect. Pettus requested leave from work because he believed he was suffering a stress-related disability. He was instructed that, under company policy, his disability had to be verified in a medical examination paid for and arranged by Du Pont before leave would be granted. Pettus complied with company procedure without objection, and submitted to three medical examinations as instructed, including the physical examination performed by Dr. Collins and two psychiatric examinations, the first conducted by Dr. Cole, the second by Dr. Unger. When Pettus submitted to medical examinations to have his disability validated, there was no "proceeding" as contemplated by subdivision (c)(8)(A). Nor were Pettus and Du Pont at that point two "parties" presenting opposing versions of a situation over which they disagreed to a neutral decision maker in such a "proceeding."[23]

There is a more fundamental reason why section 56.10, subdivision (c)(8)(A) cannot be held to apply to an in-house dispute over an employee's entitlement to medical leave under an established employer policy providing for same. ██ It is an established tenet of statutory construction that separate items in a statute should be given meaning with reference to the whole, and that each word and phrase in the statute should be interpreted "to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose." (*Harris* v. *Capital Growth Investors XIV, supra*, 52 Cal.3d at p. 1159.) Even more to the point, " 'It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to

---

[23]Du Pont's and Pettus's conduct at that time is more akin to the ordered performance of parties to a *contract* providing for disability leave benefits under certain conditions. In that regard, a "claim or challenge" never arose because Du Pont immediately granted Pettus's request for leave once Dr. Collins found him to be disabled by stress, and extended that leave when Dr. Cole confirmed her diagnosis.

include the subject to which the more particular provision relates.'" (*San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147], quoting *Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505].) "To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute." (*Salazar* v. *Eastin* (1995) 9 Cal.4th 836, 857 [39 Cal.Rptr.2d 21, 890 P.2d 43]; see also Code Civ. Proc., § 1859; *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *Yoffie* v. *Marin Hospital Dist.* (1987) 193 Cal.App.3d 743, 751 [238 Cal.Rptr. 502]; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172].)

■ Section 56.10, subdivision (c)(8)(B) is clearly more specific to the facts of this case than is subdivision (c)(8)(A). The permissive exception under subdivision (c)(8)(B) contemplates the situation where an employee is required to submit to a medical evaluation paid for and arranged by his employer as a prerequisite for approval of a disability leave request. Thus, even if an employer-employee dispute over medical leave involves a "claim," the more specific provision—subdivision (c)(8)(B)—should be held to govern such disputes. We decline to resolve this case under subdivision (c)(8)(A) because by doing so we would be writing subdivision (c)(8)(B) out of the statute.

Furthermore, even if we were to view the dispute between Pettus and Du Pont as a "law suit, arbitration, grievance, or other claim or challenge" within the purview of section 56.10, subdivision (c)(8)(A), it is clear from Du Pont's course of conduct that the information obtained from the respondent psychiatrists was not only "used or disclosed in connection with that proceeding." (§ 56.10.) The information about Pettus's drinking habits and his anger toward Judy Mendonca and Du Pont was also "used" as the basis for other personnel actions with respect to Pettus, i.e., to condition his continued employment on attendance at an inpatient alcohol treatment program and, ultimately, to terminate his employment. Such uses of Pettus's private medical information were well beyond the scope of the dispute over his entitlement to a disability leave under Du Pont's policy. Thus, Drs. Cole and Unger cannot find refuge in subdivision (c)(8)(A).

5. *Section 56.10, subdivision (c)(9), Is Inapplicable in the Factual Circumstances of This Case.*

■ Drs. Cole and Unger also contend that subdivision (c)(9) of section 56.10 shields them from liability. We disagree. The fact that Pettus requested

leave under Du Pont's short-term disability policy does not permit full disclosure to Du Pont as the "sponsor, insurer, or administrator" of the policy under subdivision (c)(9). Drs. Cole and Unger disclosed highly personal medical information directly to Pettus's second-line supervisor, Bob Rotter. The Du Pont short-term disability plan may indeed fall into the category of a self-insured "plan or policy" within the meaning of subdivision (c)(9). Nevertheless, there is no indication that Rotter was the "sponsor, insurer, or administrator" of the plan, or otherwise an appropriate recipient of the highly personal medical information contained in the psychiatrists' reports. If we accepted respondents' argument under subdivision (c)(9), we would in effect be manipulating Du Pont's self-insured status to contravene subdivision (c)(8)(B), the purpose of which is to ensure the confidentiality of employees' medical information as against their employers unless there is a legitimate need for disclosure. Even if Du Pont can be considered both an employer and a "sponsor, insurer or administrator" of an employee benefit plan, these two roles are separate and are treated differently in the exceptions under section 56.10, subdivision (c). The argument that the full disclosure to Du Pont in its capacity as a "sponsor, insurer or administrator" of a benefit plan may be permissible under subdivision (c)(9) does not address the reality that full disclosure was made to Pettus's on-site supervisor. This type of disclosure is clearly restricted as delineated in subdivision (c)(8)(B).[24]

### C. *Section 47, Subdivisions (b)(2) and (c), Are Inapplicable to Claims for Violation of the CMIA.*

Respondent Cole also contends his communications to Du Pont are privileged under section 47, subdivision (b)(2) (hereinafter section 47(b)(2)), and section 47, subdivision (c) (hereinafter section 47(c)). However, these provisions are inapplicable in the circumstances of this case.

Section 47(b)(2) is described in *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365] as being similar to the common law

---

[24]If full disclosure was made to Du Pont in its capacity as an "insurer," under the Insurance Information and Privacy Protection Act (Ins. Code, § 791 et seq. (hereinafter IIPPA)), no information exceeding the parameters established in subdivision (c)(8)(B) of section 56.10 could have been released to Du Pont in its capacity as employer without Pettus's specific authorization. Under the IIPPA, an insurer is prohibited from releasing medical information unless detailed patient authorization requirements, substantially similar to those in the CMIA, are satisfied. (Ins. Code, § 791.13.) Du Pont the insurer cannot permissibly fully disclose to Du Pont the employer unless it has obtained a signed, dated authorization form from Pettus specifying, among other things, the persons authorized to receive the information and the nature of the information authorized to be disclosed. (Ins. Code, § 791.06.) No such authorization was obtained. We decline to apply subdivision (c)(9) to these facts when doing so would have the effect of sidestepping the limitation on disclosure under subdivision (c)(8)(B), which is clearly applicable to the request for disability leave in this case.

litigation privilege. (*Id.* at p. 213.) The purpose of this codified litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions; to "promote[] the effectiveness of judicial proceedings by encouraging 'open channels of communication and the presentation of evidence' in judicial proceedings. . . ." (*Id.* at p. 213, citation omitted.) The policies underlying this statute are clearly intended to promote the accessibility and viability of the judicial system. The process through which Pettus sought to secure disability leave was not a judicial proceeding. Rather, it was established, implemented and overseen solely by Du Pont management. A different set of considerations is at issue in this case.

Respondent Cole correctly points out that the section 47(b)(2) privilege has been applied to "quasi-judicial proceedings" as well as judicial proceedings. However, as we have already discussed, we disagree with his conclusion that the disability evaluation at issue here can be characterized as a quasi-judicial proceeding. Section 47(b)(2) has been extended to quasi-judicial proceedings where those proceedings involve an administrative body or agency's decisionmaking process. Quasi-judicial immunity has been made available for a mediator in a child custody dispute (*Susan A.* v. *County of Sonoma* (1991) 2 Cal.App.4th 88 [3 Cal.Rptr.2d 27]), and applied to statements published in an arbitration hearing (*Ribas* v. *Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417]). Proceedings undertaken by an official investigative and enforcement branch of the Internal Revenue Service have also been characterized as quasi-judicial. (*Tiedemann* v. *Superior Court* (1978) 83 Cal.App.3d 918 [148 Cal.Rptr. 242].) One of the primary factors which determines if a proceeding is quasi-judicial is whether the administrative body involved is entitled to hold hearings and decide issues by application of rules of law to ascertain facts. (*Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656].) Pettus's request for leave and the subsequent disability verification procedure involved no such dispute resolution mechanism, no hearings, and the only decision makers involved were a private employer, Du Pont, and its employees and agents. The context in which respondent doctors disclosed medical information to Du Pont was not a "quasi-judicial proceeding," within the meaning that term has acquired in litigation under section 47(b)(2).

Respondent Cole alternatively argues that his disclosure was privileged under section 47(c). This provision establishes a more general privilege of communication between two interested parties, but respondents'

disclosures to Du Pont do not fall under its protection.[25] When the communication involves a disclosure of an employee's medical information by a health care provider to an employer, the more specific privileges established by the CMIA supersede the general privilege afforded under section 47(c). (See *San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th at p. 577; *Rose* v. *State of California, supra,* 19 Cal.2d at pp. 723-724; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d at p. 965; and cf. *Davis* v. *Superior Court* (1992) 7 Cal.App.4th 1008 [9 Cal.Rptr.2d 331] [specific rules governing issues of privilege and privacy prevail over general rules permitting discovery].) The Legislature enacted the CMIA to protect the interest of individuals in maintaining the confidentiality of individually identifiable medical information created by health care providers, without regard to whether the provider had reasonable grounds for believing the recipient party's motives for receiving the information were innocent. Thus, where section 56.10 affords this type of information a greater level of protection from disclosure by health care providers, it must be read to limit the privilege of communication established under section 47(c).

D. *Pettus Made a Prima Facie Showing That the Disclosure of Detailed Medical Information by Drs. Cole and Unger Also Violated His Right to Privacy Under Article I, Section 1 of the California Constitution.*

Having concluded that the disclosure of detailed medical information by Drs. Cole and Unger to Pettus's employer violated his rights under the CMIA, we must decide whether Pettus has established that this conduct also constitutes a violation of his state constitutional right of privacy. Under standards enunciated by our Supreme Court while this matter was pending on appeal, the application of which has been fully briefed and argued by the parties, we conclude that Pettus, upon completion of his case-in-chief, made a prima facie showing of invasion of his constitutional right of privacy. However, based on evidence presented by Du Pont in its defense case, there is a serious question whether Pettus waived any constitutional claim against Drs. Cole and Unger by voluntarily disclosing to his supervisors at Du Pont much of the sensitive personal information that was subsequently transmitted in the psychiatrists' reports. The trial court did not have that evidence before it when it decided the respondent psychiatrists' motion for judgment pursuant to section 631.8, and neither the psychiatrists nor Pettus had an

---

[25]Under section 47(c), a privileged publication is one made "[i]n a communication, without malice, to a person interested therein, (1) by one whom is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

opportunity to develop and/or respond to that evidence as it bore on Dr. Cole's and Dr. Unger's liability for violation of Pettus's constitutional right of privacy. For this reason, we will remand to the trial court to afford these parties an opportunity to present further evidence relevant to this claim.

### 1. *An Overview of California Constitutional Privacy Law.*

 Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and *pursuing and obtaining* safety, happiness, and *privacy.*" (Italics added.) In *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (hereinafter *Hill*), our Supreme Court definitively held that the privacy clause of article I, section 1, of the state Constitution "creates a right of action against private as well as government entities." (*Hill, supra,* 7 Cal.4th at p. 20; see also *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 242 [256 Cal.Rptr. 194].) The *Hill* court also defined the elements of a claim for invasion of the state constitutional right of privacy, as follows: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (7 Cal.4th at pp. 39-40.)

Of course, not every act which has some impact on personal privacy will give rise to a cause of action for violation of the state constitutional right of privacy. Once the plaintiff's prima facie case has been established, "A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests. The plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." (*Hill, supra,* 7 Cal.4th at p. 40.)

 The *Hill* court also explained the methodology for evaluating the plaintiff's and the defendant's respective interests, as follows: "The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law. [¶] Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities

of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise." (7 Cal.4th at pp. 37-38.) In general, where the privacy violation is alleged against a private entity, the defendant is not required to establish a "compelling interest" but, rather, one that is " 'legitimate' or 'important.' " (*Id.* at p. 57.)[26]

"The existence of a sufficient countervailing interest or an alternative course of conduct present threshold questions of law for the court. The relative strength of countervailing interests and the feasibility of alternatives present mixed questions of law and fact. Again, in cases where material facts are undisputed, adjudication as a matter of law may be appropriate." (*Hill, supra,* 7 Cal.4th at p. 40.) We will briefly discuss each of the elements of Pettus's claim against Drs. Cole and Unger for invasion of his constitutional right of privacy, and the matters of defense that were raised in the trial court.

### 2. *Pettus Established a Legally Cognizable Interest in Preserving the Privacy of His Medical History and Psychological Profile.*

"Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill, supra,* 7 Cal.4th at p. 35.)

We have no doubt, and determine as a matter of law, that Pettus had a legally cognizable interest in maintaining the privacy of the detailed medical information he conveyed to Drs. Cole and Unger. **(13b)** "Informational privacy is the core value furthered by the Privacy Initiative" (*Hill, supra,* 7 Cal.4th at p. 35), and it is well settled that the zone of privacy created by that provision extends to the details of a patient's medical and psychiatric history (*Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 842 [228 Cal.Rptr. 545]; *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1147 [212 Cal.Rptr. 811]). As the *Cutter* court explained, "The right to control circulation of personal information is fundamental. [Citations.] This right reaches beyond the interests protected by the common law right of privacy, and may be protected from infringement by either the state or by any individual. [Citation.] The 'zones of privacy' created by article I, section 1, extend to the details of one's medical history. [Citation.] And, an individual's right to privacy encompasses not only the state of his mind, but also his

---

[26]In this respect, our Supreme Court expressly disapproved *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618], in which Division Four of this court required a private employer to show that a "compelling interest" in random urinalysis drug testing of nonsafety employees justified the concomitant invasion of its employees' state constitutional right to privacy. (*Hill, supra,* 7 Cal.4th at pp. 56-57.)

viscera, detailed complaints of physical ills, and their emotional overtones." (*Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at p. 842; see also *Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 944 [227 Cal.Rptr. 90, 719 P.2d 660] ["If there is a quintessential zone of human privacy it is the mind. Our ability to exclude others from our mental processes is intrinsic to the human personality." (Fn. omitted.)]; *Kees* v. *Medical Board* (1992) 7 Cal.App.4th 1801, 1813 [10 Cal.Rptr.2d 112] [same]; *Davis* v. *Superior Court, supra,* 7 Cal.App.4th at p. 1019 [a person's medical profile is an area of privacy which cannot be compromised except upon good cause; right of privacy extends to the details of one's personal life].)

 A review of Dr. Cole's and Dr. Unger's written reports clearly demonstrates the private nature of the information transmitted to Du Pont. These reports were quite thorough and detailed in their discussion of: the rash that covered Pettus's body, the medication he was using to treat it, and his fears about that medication causing cancer; his sleep patterns and sex drive; his hostile feelings toward certain current and former coworkers and supervisors; past suicidal feelings; his smoking and drinking patterns; a social history of his life from the time of his birth, with his family of origin, through a marriage and divorce, to the present; and his anxious and highly emotional behavior during the interview (crying, wringing his hands, burying his face in his hands, jumping out of his chair and removing his shirt to reveal the marks on his skin from the rash medicine). Certainly, this is the type of "sensitive personal information" the California voters had in mind when they adopted the constitutional privacy guarantee, expressly limiting the freedom of both government and business entities to obtain, disseminate and use such data. (See *Hill, supra,* 7 Cal.4th at pp. 16-17.)

3. *The Evidence Presented in Pettus's Case-in-chief Established That He Had a Reasonable Expectation of Privacy in the Detailed Medical Information Conveyed to Drs. Cole and Unger.*

 " 'The extent of [a privacy] interest is not independent of the circumstances.' " (*Hill, supra,* 7 Cal.4th at p. 36, quoting *Plante* v. *Gonzalez* (5th Cir. 1978) 575 F.2d 1119, 1135.) "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." (*Hill, supra,* at p. 37.) Various factors such as advance notice, customs, practices, justification, physical settings and the presence of an opportunity to consent may inhibit or diminish reasonable expectations of privacy. (*Id.* at pp. 36-39.) "For example, advance notice of an impending action may serve to ' "limit . . . intrusion upon the personal dignity and security" ' that would otherwise be regarded as serious." (*Id.* at p. 36 [referring to a sobriety checkpoint].)

 Taking into account the circumstances of this case—at least insofar as those circumstances were established at trial by the time Drs. Cole and

Unger made their successful motion for judgment pursuant to Code of Civil Procedure section 631.8—Pettus's expectations of privacy in the information imparted to Drs. Cole and Unger were not unreasonable. Unlike the intercollegiate athletes in *Hill,* who routinely disrobe in the presence of other people and whose privacy is routinely intruded upon by regular physical examinations and special scrutiny of their fitness, diet, sleep activities and other habits (7 Cal.4th at pp. 55-53), it is reasonable for employees to expect that details of their personal lives and thoughts will be shielded from scrutiny by their employers.[27] (See *id.* at p. 54 ["Employment settings are diverse, complex, and very different from intercollegiate athletic competition."].) It is true, as a general matter, that Pettus put his mental condition in issue by requesting paid leave under Du Pont's disability policy. It is also true that Du Pont had a right to know whether Pettus was in fact disabled by stress and, perhaps, whether or not his disability was work related,[28] before it was bound to provide Pettus with paid disability leave. But the detailed psychiatric information Du Pont requested and obtained from Drs. Cole and Unger, and ultimately used to make adverse personnel decisions about Pettus, was *far more* than the employer needed to accomplish its legitimate objectives.[29] It also exceeded the scope of disclosure to which Pettus may be deemed to have consented either expressly or impliedly when he requested disability leave, submitted to psychiatric evaluation, and orally acknowledged that Dr. Cole would be reporting back to Du Pont.

There is no reason in law or policy why an employer should be allowed access to detailed family or medical histories of its employees, or to the

---

[27]It appears to be true, as Dr. Unger points out, that Du Pont requires its employees to submit to annual physical examination by a Du Pont physician who routinely reports back to Du Pont the contents and results of such examination. Indeed, Pettus was examined by Dr. Collins in early May 1988 pursuant to this requirement. But there is no indication that this annual examination routinely includes a *psychiatric* assessment. On the contrary, Dr. Collins did not attempt to obtain an evaluation of Pettus's mental condition until Pettus requested disability leave.

[28]We note, however, that Du Pont did not treat the information about the industrial nature of Pettus's condition as relevant. Instead, when Dr. Cole reported his opinion that Pettus's disability was work related, Du Pont immediately granted Pettus's request for a paid leave under its short-term disability policy, which applies only to nonoccupational illness or injury.

[29]We recognize that the experts called by appellant testified that Dr. Cole's and Dr. Unger's reports incorporated the items customarily addressed in a disability evaluation. However, except for Dr. Cole, none of the physician witnesses testified that it was customary among California psychiatrists to transmit the full, detailed report to the employer without the employee's consent. As we have discussed, such testimony would be an admission that psychiatrists customarily violate section 56.10. For his part, Dr. Cole merely testified it was his understanding that employers expected the type of report he prepared for Du Pont, that detailed personal information was useful to the employer in figuring out how to get the employee back to work, and that, in his experience, other physicians in his "peer group" provided employers with more than just a finding of disability. Dr. Cole did not define his "peer group," and did not provide further testimony about the scope of reporting that customarily occurs in disability leave cases.

intricacies of its employees' mental processes, except with an individual employee's freely given consent to the particular disclosure or some other substantial justification.[30] Indeed, the Legislature recognized as much when it enacted section 56.10, allowing health care providers to disclose only narrow categories of medical information about employees, and then only for certain narrow purposes. In the context of this case, where the information was generated in connection with a request for leave for medical reasons, subdivision (c)(8)(B) of section 56.10, is *itself* confirmation of the reasonableness of Pettus's expectation that Drs. Cole and Unger would maintain the confidentiality of his discussions with them, except insofar as Du Pont needed their opinions as to whether he was disabled, i.e. whether he had "functional limitations" that entitled him to "leave from work for medical reasons," or limited his "fitness to perform his . . . present employment . . . ." It is difficult to imagine a clearer expression of "broadly based and widely accepted community norms." (*Hill, supra,* 7 Cal.4th at p. 37; and cf. *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 831-832 [134 Cal.Rptr. 839] [relying on state and federal statutes governing confidentiality of student records as basis of claim for invasion of state constitutional right of informational privacy].) Thus, except for the disclosures that are expressly authorized by the CMIA, we conclude that Pettus's expectation that the psychiatrists would maintain the confidentiality of the contents of their discussions was reasonable in the circumstances.

4. *Evidence Presented During the Plaintiff's Case-in-chief Established That the Disclosures by Drs. Cole and Unger Seriously Interfered With Pettus's Informational Privacy Rights.*

 The final element of Pettus's prima facie case of invasion of privacy is the seriousness of the intrusion: "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Hill, supra,* 7 Cal.4th at p. 37.) The impact on the claimant's privacy rights must be more than "slight or trivial." (*Ibid.*) In this case, based on the evidence presented in his case-in-chief, Pettus established that the revelation of at

---

[30]Of course, where a psychiatric injury or illness arises out of and in the course of employment, the rights and duties of the employer to provide and of the employee to participate in effective medical treatment are defined in great detail by worker's compensation law. (See Lab. Code, §§ 4050 et seq. [medical examinations], 4600 et seq. [medical treatment]; see also *id.,* § 3208.3 [psychiatric injuries].) There is also an elaborate system for resolving disputes over medical examinations and reports, medical treatment, employee privacy rights, and other issues. He might also have had better protections against termination in that system. (See Lab. Code, § 132a.) There is in this case, however, no question of Pettus's entitlement to workers' compensation benefits.

least some of the information contained in the psychiatrists' reports—e.g., information about his past and present drinking habits, and his strongly held views about racism among his coworkers and Du Pont management—was highly embarrassing to him. Indeed, Pettus testified that he was humiliated when he learned that the psychiatrists had communicated to Du Pont their belief that he was abusing alcohol, and that alcohol abuse was the root cause of his psychological problems. Up to that point, Pettus had maintained a self-concept and a public persona as a dedicated, hard-working, reliable Du Pont employee who performed his job duties in a satisfactory manner and never came to work under the influence of alcohol or drugs. It is no exaggeration to say that that image was shattered when Drs. Cole and Unger transmitted their reports to Pettus's managers at Du Pont.

The *Hill* court explained the importance to an individual of being able to control his or her public image, and described the psychological damage that can result from unexpected disclosure of highly personal information: "Privacy rights also have psychological foundations emanating from personal needs to establish and maintain identity and self-esteem by controlling self-disclosure: 'In a society in which multiple, often conflicting role performances are demanded of each individual, the original etymological meaning of the word "person"—mask—has taken on new meaning. [People] fear exposure not only to those closest to them; much of the outrage underlying the asserted right to privacy is a reaction to *exposure to persons known only through business or other secondary relationships.* The claim is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask. Loss of control over which 'face' one puts on may result in literal loss of self-identity [citations], and is humiliating beneath the gaze of those whose curiosity treats a human being as an object.' " (*Hill, supra,* 7 Cal.4th at p. 25, first italics added for emphasis, quoting *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1], fn. omitted.)

Anyone who has ever been an "employee" can relate to the *Hill* and *Briscoe* courts' discussion of the importance of protecting an individual's right to informational privacy, especially as against employers and others with whom the individual maintains only a business relationship. The "employee" mask is one that helps workers maintain an aura of competence, efficiency, professionalism, social propriety, seriousness of purpose, etc., allowing them to perform their duties to the satisfaction of their employers but simultaneously to protect their job security and, thus, their economic well-being. Many employees choose to conceal from their employers matters of disability, sexual orientation and conduct, political affiliation or activities, family or marital strife, unconventional life styles or avocations, etc., out of

fear that, no matter how well they might perform in the workplace, revelations about these or other aspects of their private lives may cost them their jobs. In general, this approach is one that benefits both employees and employers, who often stress that employees should not bring their personal problems to work with them or pursue personal interests while they are "on the clock," and who would not always wish to be identified as somehow connected with their employees' private conduct. In return, it is only fair that employees be allowed to maintain a wall of privacy around highly personal information about their other "roles" in life, to be free to tell their employers, in effect, "It's none of your business what I do—and think—on my own time."

Drs. Cole and Unger knew that they were sharing detailed personal and medical information about Pettus with his employer. They did not necessarily know the use(s) to which Du Pont might put the information. But they can fairly be charged with knowing that the information they were disclosing was of a type that could prove to be highly embarrassing to Pettus, and/or disruptive of his relationship with his employer. According to Pettus, the disclosures caused great damage both to his self-concept and to his professional image in the eyes of his employer. In these circumstances, we conclude Pettus adequately established that the intrusion into his right of informational privacy was sufficiently serious as to establish the third element for a violation of article I, section 1 of the California Constitution.

> 5. *No Adequate Justification Has Been Established for the Invasion of Pettus's Privacy Interests and He Has Shown That Equally Effective, but Less Intrusive, Alternatives Were Available to Serve Du Pont's and the Psychiatrists' Competing Interests.*

We turn next to an examination of the countervailing interests asserted by Drs. Cole and Unger to justify the invasion of Pettus's privacy, and determine whether Pettus has shown that there were equally effective, less intrusive means to serve those interests. (*Hill, supra,* 7 Cal.4th at p. 40.) Essentially, Drs. Cole and Unger explain that they gave Du Pont a full, detailed psychiatric report because that is what employers *expect* to receive when they retain a psychiatrist to evaluate an employee for disability leave.[31] Respondents further assert that Du Pont "needed" the detailed report in order to evaluate Pettus's request for disability leave, and to formulate a plan for

---

[31]None of the parties explicitly discuss these employer "expectations" as based on some notion of the employer "getting its money's worth" when it has to retain expensive medical professionals to evaluate an employee's disability. Nor do the psychiatrists assert an economic interest in repeat business from employers as the explanation for giving the employers what they want. To the extent that such personal financial concerns are implicit in the defendants' "justification" arguments, we do not believe that such interests outweigh the individual employee's fundamental constitutional right to privacy.

getting him back to work as soon as possible. When balanced against the Pettus's privacy interests, and viewed in light of available alternatives, neither of these justifications carries the day.

If employers expected to receive detailed medical information in order to process medical leave requests before the enactment of the CMIA in 1981, those expectations should have been altered when subdivision (c)(8)(B) was added to section 56.10 by the 1981 amendments. Physicians who previously honored those pre-CMIA expectations should also have adjusted their understanding of the balance between employers' business interests and employees' privacy rights in that context.

As to the employers' asserted "need" for detailed medical information about their employees, we recognize that employers have important and legitimate interests in maintaining an efficient and productive work force. Employers also have substantial latitude in regulating their employees' on-the-job conduct and working relationships. They are, thus, entitled to notice when an employee cannot perform some or all of the essential job functions assigned to that employee and, if the employee hopes to avail himself of paid leave benefits, to such information as is necessary to make an evenhanded decision about the employee's eligibility for such leave. But again, a medical opinion by an employer-aligned physician as to the existence of "functional limitations," and as to the "industrial versus nonindustrial" nature of the injury, is what the employer "needs" to know to make that eligibility determination. However, contrary to the respondents' argument, employers do not have a cognizable interest in dictating a course of medical treatment for employees who suffer nonindustrial injuries.[32] That is a matter for the employees to decide, in consultation with their own health care providers—medical professionals who have their patients' best interests at heart.[33]

Dr. Unger further contends that Du Pont had a legitimate interest in assessing Pettus's potential for violence, especially toward Judy Mendonca. While quite plausible on its face, this argument is too simplistic and sweeping in its implications. It is, of course, true that employers have a legitimate—indeed compelling—interest in maintaining a safe working environment for their employees. It is another matter altogether to say that an employer can require an employee to submit to examination by an employer-aligned psychiatrist whenever it learns that an employee is angry and

[32]We emphasize that we are not dealing here with state-mandated workers' compensation benefits but, rather, with Du Pont's voluntarily adopted, and privately administered, disability leave program. The balance between employees' privacy and employers' interests within the workers' compensation system is an issue that must be left for another day. (See ante, fn. 29.)

[33]We will discuss this issue in greater detail in part III.C., post.

resentful toward a coworker, and is thereafter entitled to the type of detailed report, including a full psychiatric history and evaluation, that Drs. Unger and Cole provided to Du Pont. Both of these psychiatrists, along with appellant's own therapist, Dr. Shervington, already had a common law duty to warn Mendonca, and possibly Du Pont, if at any time they determined that Pettus presented "a serious danger of violence" to her or any other reasonably identifiable Du Pont employee. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 431 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] (*Tarasoff*); § 43.92; see also Evid. Code, § 1024; *Menendez* v. *Superior Court* (1992) 3 Cal.4th 435, 452 [11 Cal.Rptr.2d 92, 834 P.2d 786].) Nothing we say today is intended to limit that duty in any way, but neither do we intend to expand it. If Pettus had indeed posed a danger of serious violence to Mendonca or any other identifiable Du Pont employee, Drs. Cole, Unger, and Shervington were at all times free to disclose that fact to the possible victim—but only that fact. (*Tarasoff*, *supra*, 17 Cal.3d at p. 441; see also *Cutter* v. *Brownbridge*, *supra*, 183 Cal.App.3d at p. 843 ["[E]ven when the balance tips in favor of disclosure, constitutional concerns require a strict circumscription of the scope of the disclosure."].)[34] In other words, Du Pont's (and Mendonca's) interest in a safe workplace would have been as well served if the psychiatrists had simply honored their duties under existing law. There is, however, no indication that any of them found it necessary or appropriate to give a *Tarasoff* warning to Mendonca, and neither Dr. Cole nor Dr. Unger has asserted that their reports to Du Pont were made in fulfillment of their duties under that case or section 43.92. Of course, Dr. Unger would have been hard pressed to take such a position since she testified that she did not believe Pettus was dangerous.

In sum, based on the evidence presented in Pettus's case-in-chief, we hold that the disclosures by Drs. Cole and Unger of detailed medical and psychiatric information about Pettus to his direct supervisors were a serious violation of Pettus's reasonable expectations that the psychiatrists would maintain the confidentiality of such highly sensitive information. We further conclude that the justifications offered by respondents do not outweigh Pettus's informational privacy interests, and that there were less intrusive alternatives to full disclosure that would have equally well served the

---

[34]As the Supreme Court explained in *Tarasoff*: "We realize that the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened. To the contrary, the therapist's obligation to his patient requires that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and *in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger.*" (17 Cal.3d at p. 441, italics added.)

psychiatrists' and Du Pont's interests. Accordingly, we conclude that the trial court erred when it granted the motion of Drs. Cole and Unger for judgment pursuant to Code of Civil Procedure section 631.8, thereby rejecting Pettus's claim against Drs. Cole and Unger for invasion of his informational privacy rights under article I, section 1 of the California Constitution.

### 6. *On Remand, Drs. Cole and Unger Must Be Afforded an Opportunity to Present Evidence in Defense of Pettus's Constitutional Privacy Claim.*

 Given the peculiar procedural posture of this case—i.e., related, consolidated appeals from judgments entered based on two separate bodies of evidence presented in a single bench trial—the foregoing conclusions do not end our inquiry. We have before us a record of evidence presented after the trial court granted the psychiatrists' motion for judgment pursuant to Code of Civil Procedure section 631.8, that may bear on or, indeed, defeat entirely Pettus's constitutional privacy claim against Drs. Cole and Unger. This evidence indicates that in conversations with his Du Pont supervisors in early and mid-June 1988, *before* he met with either of the respondent psychiatrists, Pettus voluntarily disclosed at least *some* of the sensitive personal and medical information subsequently transmitted by Drs. Cole and Unger to those same supervisors.

Specifically, on June 6, 1988, Pettus told Bob Rotter that the stress he was suffering stemmed from the Flint incident, that he was angry at Du Pont management, that the mere sight of Du Pont products could trigger his anger, and that he was angry at Judy Mendonca such that he wanted to hit her. On June 16, 1988, Pettus described in more detail his feelings about the way he was treated at Du Pont's Flint, Michigan plant. He even admitted that, at the time, he "[s]tarted to become an alcoholic." Pettus also elaborated on his hostility towards Judy Mendonca and towards his supervisors because of their handling of that incident. In addition, although it does not appear he ever directly confronted his Hayward supervisors with his belief that they and/or Mendonca were racists, he had already filed a lawsuit alleging that his troubles at the Flint plant were due to the racism of Du Pont and some of its employees at that facility.

While it is far from overwhelming, this evidence may be sufficient to find that, by his own conduct, Pettus waived any constitutional privacy claim he might otherwise have had against Drs. Cole and Unger. (See *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 340 [107 Cal.Rptr. 309, 508 P.2d 309]; *Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 548-551 [174 Cal.Rptr. 148].) If Pettus himself disclosed the damaging information he claims the

psychiatrists revealed to his supervisors at Du Pont, he will be hard pressed to claim any legally protected "privacy" interest with respect to that information. (*Hill, supra,* 7 Cal.4th at pp. 39-40.) He will also have a difficult time proving as an ultimate fact the reasonableness of his expectation that Drs. Cole and Unger would maintain the confidentiality of information his supervisors already knew. (*Ibid.*) Finally, even if the psychiatrists' reports contained a broader range of embarrassing information or more detail about sensitive matters than Pettus had already discussed with Rotter and Taylor (or otherwise conveyed to Du Pont), Pettus's argument that Drs. Cole and Unger "seriously" interfered with his informational privacy rights will be greatly undermined if his supervisors already knew the essential facts about those matters.

Of course, the evidence of a possible waiver is not without dispute. For instance, it clearly appears that the allegedly "private" information Du Pont used against Pettus consisted of statements he made to Drs. Cole and Unger about his drinking habits in Flint and in the months following the "Judy incident," and the psychiatrists' opinions about his use of alcohol. There is, however, no indication that anything Pettus told his supervisors before his visit with Dr. Cole was sufficient to raise a concern about a drinking problem until Dr. Cole and Dr. Unger reported the results of their respective evaluations. Further, Rotter claims to have been alarmed by Pettus's hostility and potential for violence towards Judy Mendonca and himself, about which he learned no later than June 6, 1988. But it was not until *after* Drs. Cole and Unger issued their reports that Rotter hired a security guard and began to take steps to "help" Pettus solve his anger problem. Finally, Pettus claims he was particularly embarrassed when Dr. Cole reported statements he had made about racism among his supervisors and coworkers at Du Pont's Hayward plant. As we have noted, Pettus appears to have kept those thoughts secret, and believed the psychiatrists would do likewise.

Given the sharp conflict in the evidence that arose after the trial court granted the psychiatrists' motion for judgment pursuant to Code of Civil Procedure section 631.8, and the fact that Drs. Cole and Unger never had an opportunity to present a defense, we conclude a remand to the trial court is the most appropriate course of action to resolve Pettus's constitutional privacy claims against the psychiatrists. (See *Stonewall Ins. Co.* v. *City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1824-1825, 1838 [54 Cal.Rptr.2d 176]; *Katsaris* v. *Cook* (1986) 180 Cal.App.3d 256, 269 [225 Cal.Rptr. 531].) This disposition will also give the trial court, which did not have the benefit of our Supreme Court's decision in *Hill* when called upon to render a judgment in this difficult case, an opportunity to take and weigh all

relevant evidence within the framework established by that case.[35] Accordingly, we will remand for further proceedings consistent with this opinion.[36]

### III. THE APPEAL FROM JUDGMENT IN FAVOR OF DU PONT

#### A. *Standard of Review.*

 As before, in reviewing questions of fact decided by the trial court the substantial evidence rule applies. (*Rodriguez* v. *North American Rockwell Corp., supra*, 28 Cal.App.3d at p. 447 [appellate court must view the evidence most favorably to the respondents and uphold the judgment if there is any substantial evidence to support it].) However, to the extent we are called on to review conclusions of law based on undisputed facts, we are not bound by the trial court's decision and are free to draw our own conclusions of law. (*Torrey Pines Bank* v. *Hoffman, supra*, 231 Cal.App.3d at p. 317.)

 It is undisputed that Pettus never came to work under the influence of alcohol, never imbibed alcohol before or during work, and never exhibited any behavior that indicated to Du Pont managers that he had a drinking problem. In 22 years of employment with Du Pont, no one had ever told appellant he might have an alcohol abuse problem. Du Pont's conclusion that appellant needed alcohol rehabilitation was based solely on information derived from the reports of the psychiatrists it retained to evaluate Pettus's request for disability leave, i.e., Drs. Cole and Unger.

It is also undisputed that Pettus never threatened or physically harmed anyone at Du Pont in his 22 years of service with the company, and that Dr. Unger—the psychiatrist who was specifically asked to evaluate Pettus for this purpose—did not believe he posed a danger to anyone inside or outside

---

[35]In their petition for rehearing, the respondent psychiatrists argue that there was also a question of fact whether Pettus gave them his consent—either orally or by his conduct—to provide Du Pont with the detailed information contained in their psychiatric reports. This is just another way of saying that Pettus waived his privacy interest in all the information conveyed to Drs. Cole and Unger. We have held (*ante,* at pp. 442-443) that the evidence presented in Pettus's case-in-chief establishes as a matter of law that the detailed disclosure in this case exceeded the scope of any consent established by Dr. Cole's testimony and report, or otherwise on the record of that portion of the proceedings. If Pettus's consent was in fact broader than heretofore established, the respondent psychiatrists are free to present additional evidence on this point on remand as part of their defense to Pettus's claim for violation of his constitutional right of privacy. However, further evidence of an express or implied, but unwritten, consent is irrelevant to Pettus's claim under the CMIA. (See § 56.11.)

[36]Nothing in this opinion should be construed as holding that Drs. Cole and Unger are responsible for the termination by Du Pont of Pettus's employment, or that any invasions of Pettus's privacy by Dr. Cole and Dr. Unger were equally serious one to the other or to Du Pont's. Such issues of causation and allocation of fault are best left to the trial court upon completion of any further evidentiary proceedings on remand.

the workplace. Indeed, Mr. Taylor admitted that, at the time of termination, he had never seen Pettus act violently toward anyone and that he, too, did not consider Pettus to be dangerous. It is, thus, essentially undisputed that Du Pont's sole reason for discharging Pettus was that he refused to enroll in an inpatient alcohol treatment program as directed by his employer as a condition of continued employment.[37] We will discuss each of Pettus's claims against respondent Du Pont in light of the foregoing undisputed facts.

### B. *Du Pont's Use of Confidential Medical Information in Its Possession as Grounds for Terminating Pettus's Employment Was a Violation of Section 56.20.*

We begin with an examination of Pettus's claim that Du Pont violated the CMIA—more specifically, the provisions relating to use and disclosure of medical information by employers (§ 56.20 et seq.)—by misusing information it obtained from Drs. Cole and Unger to terminate his employment. In relevant part, section 56.20, subdivision (c) provides: "No employer shall use, disclose, or knowingly permit its employees or agents to use or disclose medical information which the employer possesses pertaining to its employees without the patient having first signed an authorization under Section 56.11 . . . , except as follows: . . . [¶] (2) That part of the information which is relevant in a lawsuit, arbitration, grievance, or other claim or challenge to which the employer and employee are parties and in which the patient has placed in issue his or her medical history, mental or physical condition, or treatment may be used or disclosed in connection with that proceeding. [¶] (3) The information may be used *only* for the purpose of administering and maintaining employee benefit plans, including health care plans and plans providing short-term and long-term disability income, workers' compensation[,] and for determining eligibility for paid and unpaid leave from work for medical reasons." (Italics added.)

As before, it is undisputed that none of the health care providers involved in this case obtained a written authorization from Pettus for disclosure of their detailed psychiatric evaluations to Du Pont. Thus, Du Pont may be held liable for a violation of section 56.20, subdivision (c), if it used the medical information contained in those reports to Pettus's detriment, unless that "use" falls within one of the two above quoted exceptions to section 56.20.

---

[37]According to Mr. Montovino, it was a "long-standing policy" of Du Pont to discharge employees only for "cause." Du Pont was thus required, as a contractual matter, to have " 'a fair and honest cause or reason, regulated by good faith' " (*Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917]), before it could terminate Pettus's employment. The test for good cause is "whether the discharge was within the bounds of the employer's discretion, or instead, was trivial, capricious, unrelated to business needs or goals or pretextual." (*Wilkerson* v. *Wells Fargo Bank* (1989) 212 Cal.App.3d 1217, 1230 [261 Cal.Rptr. 185].)

Our disposition of the psychiatrists' argument about section 56.10, subdivision (c)(8)(A), precludes any argument that Du Pont is shielded by the exception for "use" of "information which is relevant in a lawsuit, arbitration, grievance, or other claim or challenge." (§ 56.20, subd. (c)(2).) As we have already discussed, Du Pont did not use the medical information it obtained from Drs. Cole and Unger "in connection with" a "proceeding" to which it and Pettus were "parties." (*Ibid.*) Similarly, Du Pont's "use" of the detailed medical information it obtained from Drs. Cole and Unger was more far-ranging than permitted by section 56.20, subdivision (c)(3). Du Pont did not simply use that information "for the purpose of administering and maintaining [its] employee benefit plans," or "for determining [Pettus's] eligibility for paid and unpaid leave from work for medical reasons." (*Ibid.*) Rather, Du Pont used the information about Pettus's "adverse" alcohol consumption and his anger toward Judy Mendonca as the basis for its decision to force him into an inpatient alcohol treatment program and, ultimately, as a basis for terminating his employment. It is from such "uses" of confidential medical information that the CMIA was intended to protect employees. Thus, to the extent Pettus suffered "economic loss or personal injury" from Du Pont's "use" of his confidential medical information, Du Pont may be held to answer in damages for violation of the CMIA. (§ 56.35.)

C. *Discharging Pettus for His Refusal to Participate in an Employer-mandated Course of Medical Treatment Was a Violation of His State Constitutional Right to Privacy.*

The trial court concluded that Du Pont was justified in discharging Pettus because he refused to enroll in an inpatient alcohol treatment program as directed by his employer as a condition of continued employment, and that Du Pont was not liable for either invasion of privacy or wrongful termination in violation of the public policy embodied in the privacy clause. It is these tort claims—one arising from the California Constitution, the other from common law—that are at the heart of Pettus's appeal from the judgment in favor of Du Pont.[38]

1. *An Overview of California Wrongful Termination and Workplace Privacy Law.*

There has been a great deal of confusion about the role of the California constitutional right to privacy in the private workplace, especially

---

[38]We note in passing that Du Pont and Pettus agree the short-term disability policy at issue in this case is not an "employee benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq. (ERISA)). The instant case is, therefore, distinguishable from *AT&T Communications, Inc.* v. *Superior Court* (1994) 21 Cal.App.4th 1673 [26 Cal.Rptr.2d 802].

when employees have resorted to the courts to claim that they have suffered some adverse personnel action for asserting or refusing to waive their constitutional privacy rights. The claims that have arisen in this context have typically involved employer-mandated drug testing. (*Semore* v. *Pool* (1990) 217 Cal.App.3d 1087 [266 Cal.Rptr. 280] (*Semore*); *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d 1 (*Luck*); *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034 [264 Cal.Rptr. 194] (*Wilkinson*).) Where the adverse personnel action is termination of employment, the parties and courts have treated the issue as one of wrongful termination in violation of public policy. (*Semore, supra,* 217 Cal.App.3d at pp. 1097-1098; *Luck, supra,* 218 Cal.App.3d at pp. 28-29; cf. *Wilkinson, supra,* 215 Cal.App.3d at p. 1039 [analyzing challenge to preemployment drug testing program under theories of invasion of privacy (Cal. Const., art. I, § 1) and unfair business practice (Bus. & Prof. Code, § 17200 et seq.)].)

Of course, a tort cause of action for wrongful termination in violation of public policy is now well established in California. (*Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1186 [26 Cal.Rptr.2d 8, 864 P.2d 88]; *Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1091-1095 [4 Cal.Rptr.2d 874, 824 P.2d 680]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 89-91 [276 Cal.Rptr. 130, 801 P.2d 373]; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 661-671 [254 Cal.Rptr. 211, 765 P.2d 373]; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170-178 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]; *Greene* v. *Hawaiian Dredging Co.* (1945) 26 Cal.2d 245, 251 [157 P.2d 367]; *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188-189 [344 P.2d 25].) The rule of these cases is an exception to the at-will employment doctrine embodied in Labor Code section 2622. (*Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at p. 1089.) "[A]n action for wrongful termination in violation of public policy must be predicated on a fundamental, well-established, substantial policy that concerns society at large rather than the individual interests of the employer or employee [citation], and that is delineated in some constitutional or statutory provision. [Citation.]" (*Hunter* v. *Up-Right, Inc., supra,* 6 Cal.4th at p. 1186.) As our Supreme Court explained in *Gantt, supra*: "A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded." (1 Cal.4th at p. 1095.)

The cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: (1) refusal to violate a statute (see, e.g., *Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167 [employee discharged for refusal to participate in an illegal scheme to fix gasoline prices]; *Petermann* v. *International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184 [employee discharged for refusal to comply with employer's instruction to lie to state legislative committee]); (2) performing a statutory obligation (see *Kouff* v. *Bethlehem-Alameda Shipyard* (1949) 90 Cal.App.2d 322, 324-325 [202 P.2d 1059] [employee discharged for taking time off from work to serve as an election officer]); (3) exercising (or refusing to waive) a statutory or constitutional right or privilege (*Semore, supra,* 217 Cal.App.3d at pp. 1096-1098 [employee discharged for refusal, based on state constitutional right of privacy, to submit to test for illegal drug use];[39] *Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168 [79 Cal.Rptr. 543], disapproved in part on other grounds in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521, fn. 10 [28 Cal.Rptr.2d 475, 869 P.2d 454] [employee discharged for engaging in union activities]); or (4) reporting an alleged violation of a statute of public importance (*Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015] [employee discharged because of his efforts to obtain a smoke-free environment; discharge was contrary to Labor Code provisions that require employers to maintain a safe and healthful workplace and protect employees' rights to criticize their working conditions]).[40]

Of the existing wrongful termination cases, *Semore* and *Luck,* both *supra,* are most closely on point for purposes of evaluating Pettus's claim that he was discharged in violation of public policy. Like Pettus, the plaintiffs in

[39]But cf. *Luck, supra,* 218 Cal.App.3d at pages 28-29 (stating, in dicta, that employee could not state cause of action for wrongful termination in violation of public policy where he was discharged for refusal to submit to urinalysis drug test; right of privacy on which claim was based was, by its very nature, not a public right).

[40]This categorization does not include cases in which the discharge is alleged to have violated public policy embodied in a statutory or constitutional provision that directly prohibits termination of employment on specific grounds. (See, e.g., *Badih* v. *Myers* (1995) 36 Cal.App.4th 1289 [43 Cal.Rptr.2d 229] [upholding a jury verdict in favor of an employee discharged because of pregnancy, by a small private employer who was not subject to state statutes that prohibit pregnancy discrimination, but who could be held to answer for wrongful termination in violation of the public policy embodied in the state constitutional provision prohibiting sex discrimination by private employers]; *Leibert* v. *Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693 [39 Cal.Rptr.2d 65] [despite employee's failure to exhaust administrative remedies provided by Labor Code section 98.7, tort action for wrongful termination allowed to proceed based on allegations that employee was discharged because of his sexual orientation in violation of public policy embodied in Labor Code sections 1101, 1102, 1102.1].)

*Semore* and *Luck* claimed that they were discharged because they refused to waive or insisted that their employers honor their state constitutional right of privacy. (*Semore, supra,* 217 Cal.App.3d at pp. 1096-1098; *Luck, supra,* 218 Cal.App.3d at pp. 28-29.) *Semore* and *Luck* arrive at opposite conclusions on the issue whether an employee can state a cause of action for wrongful termination in violation of public policy against a private employer based on allegations that the employer somehow invaded the employee's state constitutional right of privacy. Both decisions were also accompanied by vigorous dissents.

In *Semore, supra,* 217 Cal.App.3d 1087, the court reversed a trial court ruling sustaining a demurrer to a complaint for wrongful termination in violation of public policy based on allegations that the employee plaintiff was fired for refusing to submit to a pupillary reaction eye test designed to determine whether he was under the influence of drugs. Holding that the employee's state constitutional right of privacy was a sufficient public policy to serve as the basis of a wrongful discharge suit, the *Semore* court observed: "[T]he resolution of the dispute depends upon balancing an employee's expectations of privacy against the employer's needs to regulate the conduct of its employees at work." (*Id.* at p. 1097.) However, because there was insufficient information in the complaint about the employee's duties, the precise nature and reliability of the test, the handling of test results, and the employer's interests, the court declined to strike the required balance on the pleadings before it. (*Id.* at pp. 1099-1100.)

In dissent, Justice McDaniel relied on *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, to argue that the employee plaintiff was challenging the employer's drug testing policy to vindicate his personal interests, not those of the public and, thus, not could not state a claim for wrongful termination in violation of public policy. (*Semore, supra,* 217 Cal.App.3d at pp. 1107-1110.) Indeed, the dissenting justice observed, "[I]t could reasonably be argued that employees who refuse to participate in drug testing do so in *derogation* of the public interest, and employees who consent to such testing do so in protection of the public weal." (*Id.* at p. 1109, fn. 2.) Justice McDaniel further reasoned that the plaintiff's privacy interest was one that could be " 'circumvented by agreement of the parties' " without violating public policy. (*Id.* at p. 1107.) More specifically, Justice McDaniel believed that the employee and employer could lawfully agree, as a condition of continued employment, that the employee "would not assert his right to privacy (presumably, in connection with the eye test)." (*Id.* at p. 1109.)

In *Luck, supra,* Division Four of this court affirmed a judgment entered upon a jury verdict—including an award of $180,092 in economic damages

for lost compensation and benefits, plus $304,950 in tort damages, apparently under a theory of intentional infliction of emotional distress—in favor of a nonsafety employee of a railroad (a computer installer and technician) who was discharged because she refused to submit to a urinalysis drug test. (218 Cal.App.3d at pp. 8, 31.) However, in dicta that tracked Justice McDaniel's reasoning in his dissent in *Semore*, the court observed that Ms. Luck could not state a cause of action for wrongful termination in violation of public policy, saying, "The right to privacy is, by its very name, a private right, not a public one. The parties could have lawfully agreed that Luck would submit to urinalysis without violating any public interest. Such an agreement between Luck and Southern Pacific would not have been against public policy. [Citation.] Therefore, under *Foley* [v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654], there was no violation of public policy." (*Luck*, *supra*, 218 Cal.App.3d at p. 28, italics omitted.) The court further explained that there was no "consensus about whether urinalysis testing is consistent with state and federal privacy protections," and that there was no "firmly established [public] policy prohibiting urinalysis" at the time of termination. (*Id.* at pp. 28-29.)

In a strongly-worded concurring and dissenting opinion, Justice Poché said that he would have affirmed the jury's verdict on the ground that Ms. Luck had proved a cause of action for wrongful termination in violation of public policy. He rejected the majority's contention that the plaintiff had vindicated purely "private" interests, saying: "In the instant case Barbara Luck thought she located the public policy right at the start of this state's basic document which reads: 'PREAMBLE. We, the People of the State of California, grateful to Almighty God for our freedom, in order to secure and perpetuate *its* blessings, do establish this Constitution. ARTICLE I. DECLARATION OF RIGHTS. § 1. All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.' [¶] Unlike the majority I find the public policy basis for Barbara Luck's cause of action right where she finds it, and I find it to be firmly established, fundamental and substantial. What could be more firmly established than the very first section of the first article of the state Constitution? What could be more fundamental than that document's enumeration of inalienable rights? What could be more substantial than 'enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy'? Having met the requirements of *Tameny* and *Foley*, she has stated and proved her cause of action." (*Luck*, *supra*, 218 Cal.App.3d at p. 32 (dis. opn. of Poché, J.).) Justice Poché further reasoned that, "Unless we accept the perfectly logical and defensible position that inalienable personal rights

inure by their very nature to the benefit of all Californians and thus to the public benefit, we accord no practical protection to the very rights given the greatest deference by our Constitution." (*Id.* at p. 34.)

Much of the analytical difficulty encountered by the *Semore* and *Luck* courts results from their attempt to shoehorn the privacy claims at issue in those cases into the *Foley* model of a tort cause of action for wrongful termination in violation of public policy. What is really at stake in those cases, as well as in the instant case, is a violation of a fundamental state constitutional right that is directly and independently enforceable against both private and governmental entities (*Hill, supra,* 7 Cal.4th at p. 20), where the threat of discharge is simply the means by which the employer applies economic coercion to the employee's decision whether to exercise (or waive) those rights, and/or where termination of employment is a form of punishment or retaliation for the employee's choice to exercise (or refusal to waive) those rights. Although *Hill* did not arise in the employment context, it is clear from the Supreme Court's decision in that case that a discharged employee's claim against his or her employer for invasion of the state constitutional right to privacy is subject to the elements and standards announced therein. Thus, in analyzing such a claim, courts must undertake a "careful consideration of reasonable expectations of privacy and employer, employee, and public interests arising in particular circumstances." (*Id.* at pp. 55-56, fn. 20.)

### 2. *Legally Protected Privacy Interests.*

In this case, Pettus contends that Du Pont violated both his informational and autonomy privacy rights when it requested and then misused private information obtained from Drs. Cole and Unger to force him, under pain of termination, to enroll in an inpatient alcohol rehabilitation program, and thereafter terminated his employment because he refused to waive those rights. We begin our analysis under *Hill* by identifying the precise privacy interests with which Pettus claims Du Pont interfered.

As we have already discussed, Pettus had a cognizable interest in maintaining the privacy of the detailed medical information he conveyed to Drs. Cole and Unger—at least those portions of the information above and beyond what was necessary to evaluate whether he was disabled within the meaning of Du Pont's short-term disability policy. (*Hill, supra,* 7 Cal.4th at p. 35; *Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at p. 842; *Wood* v. *Superior Court, supra,* 166 Cal.App.3d at p. 1147; *Long Beach City Employees Assn.* v. *City of Long Beach, supra,* 41 Cal.3d at p. 944; *Kees* v. *Medical Board, supra,* 7 Cal.App.4th at p. 1813; *Davis* v. *Superior Court, supra,* 7

Cal.App.4th at p. 1019.) Alternatively, Pettus argues that regardless of whether it was proper for Du Pont to request and receive detailed psychiatric reports from Drs. Cole and Unger in order to evaluate his disability leave request, he had a further interest in not having his confidential medical information *mis*used by his direct supervisors as the basis for discipline, termination, or other adverse personnel actions. Such a misuse of information that was properly obtained for another purpose can also form the basis of a claim for violation of the state constitutional right to privacy. (See *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at p. 832.)[41]

Even more importantly, however, Pettus had an "autonomy privacy" interest in making intimate personal decisions about an appropriate course of medical treatment for his disabling stress condition, without undue intrusion or interference from his employer. (See *Hill, supra,* 7 Cal.4th at pp. 28-31, 35-36; *Riese* v. *St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1317-1318 [271 Cal.Rptr. 199] [right of competent adult to refuse medical treatment is grounded in both the common law and the state constitutional right of privacy]; cf. *Cruzan* v. *Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 270 [111 L.Ed.2d 224, 236-237, 110 S.Ct. 2841] [right to refuse medical treatment analyzed as 14th Amendment liberty interest]; see also *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 208 [245 Cal.Rptr. 840]; *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526, 540 [223 Cal.Rptr. 746]; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220]; *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127, 1137 [225 Cal.Rptr. 297].) This "autonomy privacy" interest is at the heart of Pettus's privacy claim against Du Pont, and is plainly sufficient to satisfy the first element of his cause of action for violation of his constitutional right of privacy.

### 3. *Reasonable Expectation of Privacy.*

We turn next to the question whether Pettus's expectations that Du Pont would honor the identified informational and autonomy privacy interests were reasonable in the circumstances of this case. As we have already discussed, it is reasonable for an employee to expect that details of his personal life and thoughts, communicated in confidence to a psychiatrist, will be shielded against scrutiny by his employer. Given section 56.10, subdivision (c)(8)(B), this is true notwithstanding the fact that the employee has placed his mental condition in issue by requesting paid leave for medical

---

[41]For this reason, and because we conclude that an unjustified interference with Pettus's *autonomy* privacy interests was established on this record, we do not believe Pettus's constitutional privacy claim against Du Pont will be affected by the resolution of the "waiver" issue discussed in part II.D.6., *ante.*

reasons, has submitted to psychiatric examination, and knows that the psychiatrist will report back to the employer. (See *Hill, supra,* 7 Cal.4th at pp. 36-37; *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at pp. 831-832 [relying on state and federal statutes governing confidentiality of student records as basis of claim for invasion of state constitutional right of informational privacy].) It is equally reasonable, pursuant to the provisions of section 56.20, for an employee to expect that extraneous information about his personal life and thoughts, communicated in confidence to a psychiatrist in an employment-related examination, will not be used by his employer as the basis for adverse personnel action.

As to Pettus's autonomy privacy interests, we are aware of no law or policy which suggests that a person forfeits his or her right of medical self-determination by entering into an employment relationship, or by requesting paid leave under a benefit plan that is voluntarily provided by the employer, or by submitting to a psychiatric examination by an employer-aligned physician. It is reasonable for the employee to believe that, notwithstanding the fact the employer is paying for the examination and will pay benefits upon adequate proof of disability, he or she will remain free to control both the information flow and the medical decisionmaking about a disabling medical condition. Indeed, it would be unprecedented for this court to hold that an employer may dictate to an employee the course of medical treatment he or she must follow, under pain of termination, with respect to a nonoccupational illness or injury. It is, thus, eminently reasonable for employees to expect that their employers will respect—i.e., not attempt to coerce or otherwise interfere with—their decisions about their own health care, including those which relate to drug or alcohol treatment.

Our conclusion on this point is bolstered by Labor Code section 1025 et seq. Section 1025 provides: "Every private employer regularly employing 25 or more employees shall reasonably accommodate any employee *who wishes to voluntarily* enter and participate in an alcohol or drug rehabilitation program, provided that this reasonable accommodation does not impose an undue hardship on the employer. [¶] Nothing in this chapter shall be construed to prohibit an employer from refusing to hire, or discharging an employee who, because of the employee's current use of alcohol or drugs, is unable to perform his or her duties, or cannot perform the duties in a manner which would not endanger his or her health or safety or the health or safety of others." (Italics added.) The "reasonable accommodation" contemplated by section 1025 is time off from work for the affected employee as necessary to participate in a drug or alcohol treatment program, at least to the extent the employer can provide such leave without undue disruption of its business. (Stats. 1984, ch. 1103, § 1, p. 3729.) Section 1026 further provides

that: "The employer shall make reasonable efforts to safeguard the privacy of the employee as to the fact that he or she has enrolled in an alcohol or drug rehabilitation program."

These Labor Code provisions may reasonably be construed as declarations of legislative policy that an employee's decision to participate in alcohol or drug rehabilitation implicates serious privacy concerns of both the informational and autonomy varieties. That is, the fact of participation in an alcohol or drug treatment program is deemed "private" information which must be treated with sensitivity by employers, and the decision to enter such a program is one entrusted to the employee, to be made "voluntarily," without employer coercion or interference. Indeed, far from being permitted to interfere, the employer has affirmative duties to *facilitate* the employee's decision to enter alcohol or drug treatment once the employee chooses that course of action. (Lab. Code, § 1025.) Thus, taken as a whole, section 1025 et seq. of the Labor Code may be viewed as a legislatively imposed limit on covered employers' prerogatives with respect to alcohol rehabilitation for their employees, and as a clear statement of the "social norms" applicable in the employment setting with respect to employer involvement—or, rather, noninvolvement—in the very private matter of employee drug and alcohol rehabilitation. ▇▇▇ Any other interpretation would violate the settled rules of statutory interpretation that a court "must . . . accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose," and that "[a] construction making some words surplusage is to be avoided." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)[42]

### 4. *Seriousness of the Intrusion.*

▇▇▇ The third element of Pettus's prima facie case of invasion of privacy is the seriousness of the intrusion or interference by Du Pont with his identified privacy interests. We have already discussed at length how the disclosure of Pettus's private medical information by Drs. Cole and Unger may have seriously undermined his self-concept and image as a "responsible employee," and disrupted his employment relationship with Du Pont. (See *Hill, supra,* 7 Cal.4th at pp. 25, 37; *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 534.) That intrusion was greatly compounded when Messrs. Rotter and Montovino used information from the psychiatrists' reports to impose a new and extremely onerous condition on Pettus's

---

[42]Of course, we do not mean to imply that an employer may never terminate an employee whose job performance is substantially impaired by alcohol or drug abuse and who, after any required notice and opportunity to address the problem, fails to maintain a satisfactory level of performance. (See Lab. Code, § 1025.) Du Pont has never contended that Pettus's job performance was adversely affected by alcohol use.

continued employment with the company: enrollment in a 30-day *inpatient* alcohol treatment program.[43] We have no doubt that this coercive course of conduct—involving both a misuse of the employee's private medical information and a penalty for his assertion of his autonomy privacy interests— was "an egregious breach of the social norms underlying the privacy right." (*Hill, supra,* 7 Cal.4th at p. 37.) Accordingly, we conclude that Pettus has established the third element of a *Hill* prima facie claim for invasion of his constitutional right to privacy.

### 5. *Countervailing Interests and Less Intrusive Alternatives.*

Finally, we must examine the countervailing interests asserted by Du Pont to justify the invasion of Pettus's informational and autonomy privacy rights, and determine whether Pettus has shown there were equally effective, less intrusive means to serve those interests. ■ But in evaluating these countervailing interests, we apply a more stringent test to determine whether Du Pont's interference with Pettus's *autonomy* privacy interests was justified: "Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest." (*Hill, supra,* 7 Cal.4th at p. 34; see also *id.* at pp. 59 (conc. and dis. opn. of Kennard, J.), (conc. and dis. opn. of George, J.), 73 (dis. opn. of Mosk, J.).) ■ Du Pont has established no such compelling interest.

We have already rejected the argument that the psychiatrists' disclosure to Du Pont of Pettus's private medical information was "necessary" to a evaluate Pettus's request for disability leave. (See *ante,* pt II.D.4.) Du Pont would have had all the information it needed to verify Pettus's disability, and to respond to Pettus's expressions of anger toward Du Pont and Judy Mendonca, if it had simply asked its retained psychiatrists to evaluate Pettus's disability claim and received the narrow disclosure authorized by sections 56.10, 56.20, and *Tarasoff, supra,* 17 Cal.3d 425.

As to Pettus's claim of interference with his autonomy privacy interests, Du Pont offers no particular justification for requiring Pettus to enroll in the alcohol treatment program. It simply avers that it did not "force" Pettus to accept medical treatment. This contention is belied by the record of Mr. Montovino's trial testimony. The two "options" Du Pont offered if Pettus

---

[43]Although it is not entirely clear that pure *liberty* interests are within the ambit of the California state constitutional right to privacy (see *Hill, supra,* 7 Cal.4th at p. 31), we would suggest that the fact that Pettus was required to surrender his personal freedom to participate in the employer-mandated alcohol treatment program made the invasion of his "autonomy" interests in medical self-determination all the more serious.

refused to enter an alcohol treatment program both amounted to termination of his employment. Appellant had no real choice other than to enroll in the Garden Sullivan program, or face the termination of his 22-year career with Du Pont.

It is also clear from this record that requiring Pettus to enroll in an inpatient alcohol program was unnecessary and inappropriate to address the problems underlying his claimed disability. As the trial court found, "From all the evidence, it is undisputed that plaintiff was not at any time an alcoholic, nor perhaps even an alcohol abuser in the more common lay use of the word." None of the physicians Du Pont consulted recommended inpatient substance abuse treatment for Pettus. Dr. Collins merely confirmed Pettus's need for disability leave, recommended a psychiatric evaluation, and referred Pettus to Dr. Cole. Dr. Cole, too, confirmed that Pettus had a legitimate medical need for disability leave and recommended an evaluation by a substance abuse specialist. That specialist, Dr. Unger, recommended that Pettus be allowed to pursue his own suggestion of a period of abstinence from alcohol to determine whether that was causing or contributing to his disability; at trial, Dr. Unger stood by her recommendation. She said that the abstinence approach was preferable to an alcohol rehabilitation program because Pettus was motivated and wanted to pursue that course of treatment, and that "it is most respectful of a person to begin at the place they want to begin."

Moreover, there were less intrusive alternatives to compelled inpatient alcohol treatment. Du Pont could have simply adhered to its own long-standing policy and allowed Pettus to continue on disability leave for another three months (with or without pay), during which he could have pursued appropriate medical treatment in consultation with his personal physician. At the end of the six-month period provided by its disability leave policy, Pettus could have been required to submit to a further evaluation by Du Pont's psychiatrists to determine whether he could safely return to and perform the essential functions of his warehouse job (or some other available, less stressful job for which he was qualified) and, if not, whether he would be able to do so within a reasonable period of time. If not, and in light of Pettus's long tenure with the company, Du Pont might have pursued Dr. Unger's suggestions of an "amicable termination . . . on negotiated mutually agreeable terms," perhaps including an "incapability pension" or other early retirement benefits, or vocational rehabilitation counseling and services. If Du Pont were not inclined to follow such a conciliatory approach, and assuming there was no unlawful discriminatory animus involved, Pettus could have at that point been involuntarily discharged without significant

legal exposure.[44] Having instead chosen to require Pettus to submit to an unwanted and unnecessary course of medical treatment as a condition of continued employment, however, Du Pont may be held to answer for violation of Pettus's autonomy privacy rights.[45]

## IV. Conclusion

For all the foregoing reasons, the judgments of the trial court are reversed and the causes remanded for further proceedings consistent with this opinion. Costs to appellant.

Kline, P. J., and Hitchens, J.,* concurred.

Petitions for a rehearing were denied October 15, 1996, and the opinion was modified to read as printed above. The petitions of all respondents for review by the Supreme Court were denied December 23, 1996. Baxter, J., was of the opinion that the petitions should be granted.

---

[44]Even if Pettus continued to be disabled, he would no longer have been "qualified" to continue his employment with Du Pont. (See *Stradley* v. *Lafourche Communications, Inc.* (E.D.La. 1994) 869 F.Supp. 442, 443-444 [regular attendance at work is an essential job function for most jobs; providing extended leave to supervisory employee would be an undue hardship for employer of disabled employee who could not return to supervisory position for an indefinite period of time because of stress inherent in that position, but transfer to available position as cable installer may have been reasonable accommodation of employee's disability].)

[45]Given our disposition of his tort claims, we will not engage in any extended analysis of appellant's claim that his discharge was also a breach of contract except to say, as a matter of law, that an employee's refusal to submit to an employer-mandated course of medical treatment is not "good cause" to terminate that individual's employment. At a minimum, discharging an employee for that reason is a breach of the covenant of good faith and fair dealing that is implied by law in every contract of employment. (See *Luck, supra*, 218 Cal.App.3d at p. 26.)

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.